Filed 8/29/13  Pike v. Pike CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ALLYSSA PIKE,<br><br>    Respondent,<br><br>    v.<br><br>JASON LANDON PIKE,<br><br>    Appellant. | D061585<br><br><br><br>(Super. Ct. No. EV19397) |

APPEAL from an order of the Superior Court of San Diego County, Darlene A. White, Commissioner.  Affirmed.

Jason Landon Pike, in pro per.

No appearance for Respondent.

I.

INTRODUCTION

Jason Landon Pike (Jason) appeals from a domestic violence prevention restraining order issued against him for the protection of his 21-year-old daughter, Allyssa Pike (Allyssa), and her two-year-old daughter.  On appeal, Jason contends that the trial court violated his right to due process through the manner by which the court

conducted the evidentiary hearing on Allyssa's request for a restraining order. Jason further contends that the court abused its discretion in issuing the restraining order. We affirm the order.[1]

## II.

### FACTUAL AND PROCEDURAL BACKGROUND

A.  *Allyssa's request for a restraining order and the trial court's issuance of a temporary restraining order*

On February 21, 2012, Allyssa filed a request for a domestic violence prevention restraining order against Jason.[2] Allyssa requested that Jason be prevented from having any contact with either her or her daughter.

Allyssa described the February 13, 2012 incident that precipitated her request as follows:

> "[Jason] came to my home (which I have never given [him the] address to, and he has no means of getting without going out of his way)[.] I caught him looking through my windows[.] I don't know how long he was standing there[,] but I immediately shut the blinds and locked the doors due to his violent past[.] I called the police to escort me and my daughter to my car to make sure he had left and the officer recommended an order."

With respect to past abuse, Allyssa stated that on May 5, 2008, Jason became "upset with what I was saying and he smacked me across my face really hard. My mom

[1]     Allyssa has not filed a respondent's brief. Accordingly, we decide the appeal on the record and Jason's opening brief. (See Cal. Rules of Court, rule 8.220(a)(2).)

[2]     The record on appeal does not contain Allyssa's request for a domestic violence restraining order or the trial court's temporary restraining order. On our own motion, we order the record augmented with these documents. (Cal. Rules of Court, rule 8.155(a)(1)(A).)

took me out of the house soon after." In addition, Allyssa stated that between 2003 and 2010, "Jason used to steal my underwear and hide them in his bedside table whenever I used to live in the house." Allyssa also stated that "there were numerous occasions when I was growing up (2003-2006) when Jason would offer me means and opportunit[ies] for me to commit suicide, urging me to 'just do it' often."

In explaining why she was seeking an order protecting her two-year-old daughter, Allyssa stated that the child lived with her and that her daughter did "not need [the] opportunity for abuse."

On the same day that Allyssa filed her request, the trial court entered a temporary restraining order directing Jason to have no contact with either Allyssa or her daughter. The court set March 7 as the date for a hearing on whether to enter a permanent restraining order.

B.  *Jason's response*

In his response opposing Allyssa's request for a restraining order, Jason stated:

> "I categorically deny these allegations. This is my daughter and granddaughter. I believe in a loving, caring family and I'm working strenuously to achieve that. Clearly, [Allyssa] wants . . . something different. Adults would talk about issues and it would be resolved."

Jason further stated that Allyssa was seeking a restraining order in order to influence a pending family court proceeding related to Jason's marital dissolution action with Allyssa's mother. Jason also filed a 10-page declaration supporting his opposition to Allyssa's request for a restraining order. In his declaration, Jason detailed both his prior relationship with Allyssa, as well as the difficult family circumstances that he was

3

currently facing related to the marital dissolution action. Jason also lodged numerous exhibits, many of which are documents related to the marital dissolution action.

C.     *The hearing*

On March 7, 2012, the trial court held a hearing on Alyssa's request. At the hearing, Allyssa described the February 2012 incident that precipitated her decision to seek a restraining order in a manner consistent with that contained in her written request. Allyssa also explained that she had not seen Jason for approximately eight months prior to the February 2012 incident.

With respect to her prior relationship with Jason, Allyssa stated that she was currently 21 years old, and that Jason was her father by way of adoption. Allyssa explained that she had lived with Jason from approximately the time she was nine years old to the time she was 17 years old, and that she had lived with Jason and her mother again for a few months between the time she was 19 and 20 years old.

Allyssa stated that after she had moved out of the family residence in November 2010, Jason showed up at her residence "unannounced" on multiple occasions. Allyssa explained that, at that time, Jason and her mother were involved in divorce proceedings and that she "wanted nothing to do with it." In February 2011, Allyssa moved again, and did not provide Jason with her new address.

Alyssa stated that in June 2011, she had a verbal confrontation with Jason when she attempted to pick up her sisters from a visitation with him, on behalf of her mother. Alyssa claimed that Jason "was refusing to give [her sisters] to [her]," and that there "was yelling on both parties' end for probably about ten minutes." Alyssa claimed that she had

4

not seen or heard from Jason after the June 2011 incident until Jason came to her residence on February 13, 2012.

When asked by the court why she had sought a restraining order, Allyssa stated:

"Because of his prior behavior when I did live in the household with him and his erratic behavior, I feared for myself and my daughter. We don't need that in our lives. I don't need that stress added to my daily life."

Jason testified at the hearing that Allyssa was seeking the restraining order in order to gain an advantage for her mother in a family court proceeding that was to take place later that month. Jason explained that he and Alyssa's mother had last lived together in February 2011, and that during the ensuing divorce proceedings Alyssa was "supporting her mother only."

Jason claimed that his relationship with Alyssa had changed as a result of an incident that occurred on February 11, 2011 when "a false domestic violence charge was generated by mother which later proved to be mother was the aggressor . . . ."[3] Jason said that during the June 2011 incident, he told Allyssa that she needed to "get help" because Jason could tell that "she was coming apart at the seams from the divorce." Jason acknowledged that he had not had any "personal" contact with Allyssa after the June 2011 incident.

With respect to the February 13, 2012 incident, Jason explained that he had gone to Allyssa's residence to deliver flowers to her for Valentine's Day. According to Jason,

---

[3] Jason lodged a copy of a September 12, 2011 family court order in which a San Diego trial court found that Alyssa's mother "was the aggressor in the incident occurring on February 11, 2011."

5

as he approached the residence, he looked in the front window because the "place look[ed] abandoned." Jason stated that when he peered in the window, "[Allyssa] appear[ed] miraculously out of nowhere." According to Jason, the following then occurred:

> "As I'm walking away from the window towards the door, she was running to the door. Click. I'm like, okay. She's still a drama queen, and I have nothing to do with that. I don't have a responsibility for her drama at this point. I have done everything I can for her. I'm still trying to reach out to let her know that I'm there for her when she's ready to talk. Obviously, it's not today."

Jason also explained that he and Alyssa "had a lot of different issues as she was growing up," and that the two had sought counseling with respect to some of these issues. Jason noted that one of their difficulties involved Allyssa "cutting herself," and that Allyssa had alluded to this issue in her request for a restraining order. Jason stated that they had been through two years of counseling dealing with the issue of Allyssa cutting herself, which culminated in the following incident:

> "I walked into the kitchen, grabbed a butter knife, came back, and set it on the table and said, okay, you go ahead and do that. I'll be your safety observer. If anything bad goes wrong, I'll call the ambulance and take care of you.
>
> "She became irate. Stormed out of the room. And then the next two weeks the counselor actually had something to hang the meat on, like a frame or a skeleton, to hang her therapy on. And Allyssa quit cutting herself within two weeks of that incident.
>
> "Was it something that was, you know, a normal parenting activity? I don't know. But it was the inspiration I had at that moment, and it seemed to work."

In rebuttal, Alyssa summarized her request for a restraining order as follows:

6

"Ramona[4] is pretty far out of the way for him. I mean, I can dispute a lot of the things he said, but pretty much everything—when it comes down to it, I don't need this in my life. I don't feel safe. I don't feel safe for my daughter.

"I have had a history of abuse from him. He indicated the time where he asked me to kill myself. There were multiple false things in the example he gave. But he's offered me to kill myself on two occasions. He has hit me in the face on another occasion."

"He has been extremely mentally and verbally abusive since I was about thirteen years old. I don't need that anymore. I don't need it."

D.    *The restraining order and Jason's appeal*

At the conclusion of the hearing, the trial court indicated that it would grant

Allyssa's request for a restraining order, reasoning in part:

"In this case I heard very differing accounts of your relationship over the last few years. It's very clear that your dissolution has added to what already seemed to be a potentially estranged relationship with at least Allyssa, if not your other children.

"With that being said, . . . . it's not even that I don't find you particularly credible. I do find her very credible that she has a fear of you. Based on the statements made in the paperwork and the statements made here in court I do believe that by a preponderance of the evidence that burden has been met and that there is a fear of domestic violence . . . .

"It is clear you had no contact with her for reasons that the two of you both have. But particularly statements made over the last year about your uncomfortable and awkward and inappropriate contact that you've had and then all of a sudden you show up at her window, and she is terrified over it.

"It's clear. You may think it's an unreasonable fear, but it's a fear. It's very real. To me, it's a reasonable fear that you were there for reasons that she was unclear of and to disturb her peace.

---

4    Alyssa lived in Ramona at the time of her request for a restraining order.

7

"With that, I am going to grant a restraining order for a period of one year. I don't believe that this restraining order was brought based on the time of the family court services report. Just based on the mere fact that you showed up right before Valentine's Day for whatever reason at that time, that's what caused her to come in. The timing is what the timing is, because you showed up and were looking through her windows.

"That raised a fear that caused her to call the sheriff to be escorted to her car and come in to request a restraining order. There is a history here. I do find that she is credible in that regard and that she does have a reasonable fear by a preponderance of the evidence."

Also on March 7, the trial court entered a formal restraining order. Among other restrictions, the order prevented Jason from having contact with either Allyssa or her two-year-old daughter for a period of one year. That same day, Jason timely appealed the restraining order.[5]

### III.

### DISCUSSION

A. *The trial court did not deprive Jason of the right to due process through the manner by which the court conducted the evidentiary hearing on Allyssa's request for a restraining order*

Jason contends that the trial court violated his right to due process through the manner by which the court conducted the evidentiary hearing on Allyssa's request for a

---

[5] The trial court's restraining order expired on March 6, 2013. Even assuming that Jason's appeal is moot in light of the expiration of the order, we exercise our discretion to consider the issues that he raises on appeal on the merits since those issues are capable of repetition yet likely to avoid review given "the lengthy process of a typical appellate proceeding." (*K.G. v. Meredith* (2012) 204 Cal.App.4th 164, 175.)

restraining order. Jason raises several arguments in support of this contention. We consider each in turn.

First, Jason maintains that the trial court erred in failing to hold an "evidentiary hearing," and that "[t]he only 'hearing afforded by the trial court was a short oral argument, in which no witnesses were called and in which [Jason] was not allowed to present evidence." The transcript of the hearing indicates that both Allyssa and Jason presented testimony under oath, and that the court offered both parties the opportunity to call additional witnesses. Thus, the court neither failed to hold an evidentiary hearing on Allyssa's request, nor prevented Jason from presenting evidence at the hearing.[6]

Second, Jason contends that "there is no reference or appearance that the court even considered or weighed the declarations and evidence submitted by [Jason]." At the outset of the hearing, the trial court confirmed that it had received Jason's response to Allyssa's request for a restraining order and "a stack of lodged documents." The trial court also stated during the hearing:

---

6    At the beginning of the hearing the court stated, "Do you and each of you solemnly state that the evidence you shall give in this matter shall be the truth, and nothing but the truth, so help you God?" Jason and Allyssa both responded in the affirmative. Shortly thereafter, the following colloquy occurred:

> "The Court: Is either side planning on calling any witnesses, or is it just me hearing from each of you?
>
> "[Allyssa]: Just myself.
>
> "The Court: Just you.
>
> "[Jason]: I think that would . . . that's all that's necessary, ma'am."

9

"Sir, I have reviewed the documents that you submitted and I have a fairly good grasp on the history—not every word of every page, I'll tell you honestly—but I looked through the exhibits.[7]  I do somewhat understand what your position is based on the exhibits. But I'm going to let you respond as to the request for a restraining order and why you believe that the request should be denied."

Thus, the record does not support Jason's contention that the trial court failed to consider his evidence.

Finally, Jason contends that the trial court denied him the right to cross-examine Allyssa at the hearing.  During the hearing, Jason testified that he knew where Allyssa lived.  After Jason finished his testimony, the following colloquy occurred:

"[Allyssa]: Can I first ask the published source of my address?  Am I allowed to know so I can protect myself in the future?  That's scary for me.

"The Court: *Well, technically, you can ask each other questions if you want to, but I generally don't open that door.*  Most of us can put our name on the internet and our address will come up under some source.  I will let you know that.  It happens to all of us.  We're out there on the internet with our location.  It's fairly easy to find out somebody's location."  (Italics added.)

While Jason cites the italicized portion of the trial court's comments in support of his contention that the court deprived him of his right to cross-examine Allyssa, those comments were made in response to Allyssa's inquiry regarding whether she could ask Jason how he obtained her address, *not* a request by Jason to be permitted to cross-examine Allyssa.  The court's statement clearly did not foreclose the possibility that the court would permit cross-examination if requested by a party.  If Jason wished to cross-

---

7    Jason lodged 27 exhibits in the trial court.

examine Allyssa, it was his obligation to ask the trial court to be permitted to do so. Jason did not do so. He cannot prevail on a claim that the trial court failed to permit him to engage in cross-examination that he never requested.

Accordingly, we conclude that the trial court did not violate Jason's right to due process through the manner by which the court conducted the evidentiary hearing on Allyssa's request for a restraining order.

B. *The trial court did not abuse its discretion in issuing the restraining order*

Jason contends that the trial court abused its discretion in entering the domestic violence prevention restraining order.

1. *Applicable law and standard of review*

Pursuant to the Domestic Violence Prevention Act (DVPA) (Fam. Code, § 6200 et seq.),[8] a court may issue a protective order to restrain any person for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved. (§§ 6220, 6300.) Specifically, section 6300 provides in relevant part, "An order may be issued under this part, with or without notice, to restrain any person for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved, if an affidavit . . . shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse."

The DVPA defines domestic violence as "abuse" perpetrated against enumerated individuals, including a child of a party. (§ 6211, subd. (e).) " '[A]buse' means any of the

---

[8]    Unless otherwise specified, all subsequent statutory references are to the Family Code.

following: [¶] (a) Intentionally or recklessly to cause or attempt to cause bodily injury[;]

[¶] (b) Sexual assault[;] [¶] (c) To place a person in reasonable apprehension of imminent

serious bodily injury to that person or to another[;] [¶] (d) To engage in any behavior that

has been or could be enjoined pursuant to Section 6320."  (§ 6203.)

Section 6320 provides that a trial court may issue an ex parte order enjoining a

restrained party from contacting another party, as follows:

> "(a) The court may issue an ex parte order enjoining a party from molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, harassing, telephoning, including, but not limited to, making annoying telephone calls as described in Section 653m of the Penal Code, destroying personal property, contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of the other party, and, in the discretion of the court, on a showing of good cause, of other named family or household members."

Section 6340 provides that a trial court may issue an order described in section

6320 after notice and a hearing.[9]  In determining whether to grant a request for a

restraining order under the DVPA, the trial court applies the preponderance of the

evidence standard of proof.  (*Gdowski v. Gdowski* (2009) 175 Cal.App.4th 128, 137.)

---

[9]    In *In re Marriage of Nadkarni* (2009)173 Cal.App.4th 1483, 1494-1495, the court explained the procedures governing the issuance of ex parte temporary restraining orders and permanent restraining orders entered after a hearing under the DVPA:

> "The procedure for obtaining an ex parte temporary restraining order is set forth in section 240 et seq.  Under section 242, when an application for a temporary restraining order is granted, the order must include an order to show cause why a permanent restraining order should not be granted and set a hearing date within 20 or 25 days."

In *Nakamura v. Parker* (2007) 156 Cal.App.4th 327, 334, the court explained that these provisions confer wide discretion on trial courts to determine whether to issue an order pursuant to the DVPA:

> "The foregoing provisions of the DVPA confer a discretion designed to be exercised liberally, at least more liberally than a trial court's discretion to restrain civil harassment generally. For example, the 'abuse' that may be enjoined under sections 6203 and 6320 is much broader than that which is defined as civil harassment. [Citation] Moreover, an order after hearing may enjoin civil harassment only on proof by clear and convincing evidence. [Citation] This stringent standard of proof does not apply to an order after hearing restraining abuse under the DVPA."

This court reviews a trial court's exercise of its discretion in issuing a restraining order pursuant to the DVPA for an abuse of discretion. (*Gonzalez v. Munoz* (2007) 156 Cal.App.4th 413, 420.)

2.    *Application*

In both her request for a restraining order and at the hearing, Allyssa testified that Jason had previously perpetrated physical violence against her (striking her in the face), and that she was fearful when he appeared unannounced at her residence after a period of several months during which they had had no contact with each other. Allyssa and Jason both described difficulties that they had experienced in their relationship during her teenage years, including an incident during which Jason had suggested that Allyssa cut herself with a knife. In addition, the evidence suggests that the pending dissolution proceedings involving Jason and Allyssa's mother had placed an additional emotional strain on the relationship between Jason and Allyssa.

While far from overwhelming, in light of this evidence, the trial court could have reasonably concluded that Jason had perpetrated abuse on Allyssa in the past, and that a restraining order was necessary to prevent a recurrence. Further, we cannot conclude that the trial court abused its discretion in including Allyssa's daughter among the class of persons to be protected by the order, in light of her young age, the fact that she resides with Allyssa, and Jason's history of domestic violence. (See § 6320, subd. (a) ["The court may issue an ex parte order enjoining a party from . . . disturbing the peace of the other party, and, in the discretion of the court, on a showing of good cause, of *other named family or household members*" (italics added)].)[10]

Although Jason contends that Allyssa's testimony was "suspect at best," the law is well established that "[t]he trial court is the exclusive judge of the credibility of the witnesses" (*People v. Duncan* (2008) 160 Cal.App.4th 1014, 1018), and an appellate court may not reweigh such determinations on appeal. (See, e.g., *In re Tobacco Cases I* (2013) 216 Cal.App.4th 570, 587 ["we are not at liberty to reweigh the evidence or reappraise witness credibility"].) Further, Jason's contention that "Allyssa . . . assert[ed]

---

10      We reject Jason's contention that the trial court stated at the hearing that it would not address any issues related to Allyssa's daughter at that hearing. The trial court stated that it would not address Jason's *request for visitation* with his granddaughter, which would have to be addressed in a separate proceeding. The court stated:

> "I know in your paperwork you ask for visitation with your granddaughter. That's a whole separate proceeding not done through a restraining order hearing. . . . [I]f you want grandparent visitation, there is a procedure for that. Today[,] the only thing I'm addressing is [Allyssa's] request for a restraining order against you."

that her fear stemmed from attempts by her father to contact her to deliver gifts, flowers, or cookies on holidays," mischaracterizes Allyssa's testimony at the hearing that her fear stemmed from Jason's "erratic behavior in his past as well as domestic abuse."

In sum, the record contains evidence that Allyssa and Jason had a troubled relationship in the past, including evidence that Jason had committed physical violence against Allyssa on at least one occasion. Further, while Jason may have had peaceable intentions in visiting Allyssa near Valentine's Day of February 2012, in light of the fact that they were estranged, and the then pending dissolution proceedings between Jason and Allyssa's mother, we cannot conclude that the trial court abused its broad discretion in entering a domestic violence prevention restraining order against Jason.

IV.

DISPOSITION

The restraining order is affirmed. Jason is to bear costs on appeal.


AARON, J.

WE CONCUR:

McCONNELL, P. J.

O'ROURKE, J.

15