Filed 7/24/24  Miller-Petetan v. O'Brien CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| SHIRLEY MILLER-PETETAN,<br><br>　　　Plaintiff and Respondent,<br><br>　　　　v.<br><br>THOMAS L. O'BRIEN,<br><br>　　　Defendant and Appellant. | B321498, B321532,<br>B321567<br><br>(Los Angeles County<br>Super. Ct. Nos.<br>22STRO01226,<br>22STRO01084,<br>22STRO01499) |
| MARGO LADREW,<br><br>　　　Plaintiff and Respondent,<br><br>　v.<br><br>THOMAS L. O'BRIEN,<br><br>　　　Defendant and Appellant. | |
| THOMAS L. O'BRIEN,<br><br>　　　Plaintiff and Appellant,<br><br>　　　v.<br><br>LAWRENCE LADREW, | |

APPEALS from orders of the Superior Court of Los Angeles County, Doreen Boxer, Commissioner.  Affirmed.

Shirley A. Miller-Petetan, Margo LaDrew, and Lawrence LaDrew, in pro. per., for Respondents.

Thomas L. O'Brien, in pro. per., for Appellant.

_____

Margo LaDrew (Margo) and Shirley Miller-Petetan (Miller-Petetan) obtained civil harassment restraining orders against their neighbor, Thomas O'Brien (O'Brien).  The trial court denied O'Brien's petition for an elder abuse restraining order against Margo's husband, Lawrence LaDrew (Lawrence).[1]  In this consolidated appeal from the trial court's three rulings, O'Brien asks us to decide whether the court abused its discretion in excluding testimony he wanted to introduce and in concluding he made no showing justifying issuance of an elder abuse restraining order against Lawrence.

## I.  BACKGROUND

*A.    Restraining Order Petitions*

O'Brien and the LaDrews live next door to each other in the View Park neighborhood of Los Angeles County.  The two properties are separated by an alley.  O'Brien and the LaDrews'

---

[1]     We refer to Margo and Lawrence collectively as the LaDrews.

relationship has been marked by conflict since 2018, and that conflict has drawn in other neighbors, including Miller-Petetan.

Margo petitioned for a civil harassment restraining order against O'Brien, with her husband Lawrence named as an additional protected person, in February 2022. Among other things, Margo alleged O'Brien "purposely open[ed] his garage door and just bang[ed] on the drums anytime during the day and anytime during the night," "walk[ed] around with a gun handle sticking out of his pocket to let [the LaDrews] know he has a figure of a gun," "passed [the LaDrews'] house and put his hand like a gun trigger," and "stomped [the LaDrews'] newly planted garden . . . ." In addition to seeking an order prohibiting O'Brien from harassing or contacting her, Margo asked the trial court to order O'Brien "to cease and desist playing all musical instruments."

Miller-Petetan petitioned for a civil harassment restraining order against O'Brien around the same time as Margo. Her petition included many of the same allegations.

O'Brien subsequently filed his own petitions for elder abuse restraining orders against Margo, Lawrence, and Miller-Petetan. The trial court held a hearing on all five petitions in May 2022.

### B.    Hearing Testimony
#### 1.    Margo

Margo testified her conflict with O'Brien began in 2018, when she asked him to stop blowing leaves across the alley. O'Brien called her "crazy," and she "kind of left it alone." When she raised the issue with O'Brien again later in 2018, however, he "went off" on her. Lawrence came outside, they "all had a few words," and Margo called the police.

3

In 2019, O'Brien started "playing some drums to aggravate [the LaDrews], continued to blow the leaves, [and] started writing graffiti in the alley . . . ." On July 4, 2019, when several neighbors were lighting fireworks, the LaDrews saw O'Brien in front of their home with "a young lady" who appeared to be "shaking her head like she's telling him not to do something." The next morning, the LaDrews discovered the plants in front of their home had been "stomped." Margo photographed O'Brien's house to "get the address," and O'Brien asked what she was doing. Margo and Lawrence told O'Brien they knew he had stomped on their plants, and the three argued in the street. O'Brien later apologized to Lawrence for damaging the plants and gave him $25.

The peace did not last. O'Brien "would come out and just drum any times of night or day just to antagonize [the LaDrews]." He also fired a gun in the alley at times. The trial court remarked that a recording of O'Brien's drumming played at the hearing "[did] seem to be loud." The trial court also stated another recording included O'Brien "yelling out very disturbing language."

### 2.     *Miller-Petetan*

Miller-Petetan testified that she was talking with Los Angeles County Sheriff's deputies outside O'Brien's home in February 2022 when O'Brien asked who was complaining about his drumming. Miller-Petetan was identified as one of the complainants, and O'Brien then told Miller-Petetan she "[did not] know who she [was] fucking with." A Sheriff's deputy asked O'Brien whether he was threatening Miller-Petetan, and O'Brien said, "I'm just saying if she does something, can I report her?"

4

### 3.    O'Brien

O'Brien testified that he has cancer and playing the drums is "therapeutic."  He previously played the drums inside his house, but he moved his drum set to his garage when he had children.  He did not play to antagonize his neighbors.  He installed muting devices on his drums, and generally played at times suggested by Sheriff's deputies, but the neighbors continued to complain.

O'Brien admitted he and his daughter stepped on the LaDrews' plants on July 4, 2019, but testified it was an accident and he apologized the next day.  He believed he was justified in blowing leaves across the alley because the leaves fell from the LaDrews' trees.

O'Brien testified he never threatened Lawrence, but the trial court interjected to point out an audio recording appeared to document O'Brien telling Lawrence, "I'm dying anyway, motherfucker, and when I die, . . . you better be careful, motherfucker, because you're going to be going with me."  O'Brien admitted making these statements, but he said "that was all out of anger of him approaching me, threatening me and everything . . . ."  O'Brien also admitted saying Miller-Petetan did not know who she was messing with.  He explained that he meant, "Whatever she do to me, if she make a citizen arrest on me, I'm going to turn around and make a citizen arrest on [her]."

O'Brien also accused both the LaDrews and Miller-Petetan of harassing him.  He testified the LaDrews installed lights "to flicker off and on in front of [his] house and [his] bedroom."  The LaDrews played music "real, real loud . . . to aggravate [O'Brien]," and O'Brien believed many of the other neighbors' complaints about noise from his home were prompted by the

5

LaDrews' music. Lawrence once "ran up" on O'Brien when O'Brien was talking to Margo with "a little pistol in his [waist] band" and threatened to kill O'Brien. On another occasion, according to O'Brien, Lawrence said, "Keep on playing them drums. I'll catch your ass. I'll catch your ass." O'Brien further claimed the LaDrews made statements implying someone might steal O'Brien's car, and Lawrence suggested O'Brien "would be kidnapped and all this and that." O'Brien stated the "[o]nly thing [Miller-Petetan] does is call the police and lie," but he sought a restraining order against her because he feared her sons and/or grandsons.

### 4. *Lawrence*

The trial court asked Lawrence whether he had anything to say in response to O'Brien's request for a restraining order against him. Lawrence said, "All I can say at this time, your honor, is I'm not familiar of any of the situations that he has applied—implied . . . ." The trial court summarized Lawrence's statement as "[j]ust a general denial." Lawrence agreed, "Yeah. Yeah, general denial. I don't know."

### C. *Rulings*

O'Brien asked to have his significant other testify.[2] O'Brien indicated she would discuss the July 4th incident "and the night of [Lawrence] running up on [O'Brien]," as well as "several times that [Lawrence] threatened [O'Brien]." The trial court asked what this testimony would add to O'Brien's testimony, and

---

[2] O'Brien referred to the proposed witness as "[m]y wife—my girlfriend."

O'Brien responded, "Her view—she'll tell her view of what happened." The trial court excluded the testimony as cumulative.

The trial court denied O'Brien's petition for a restraining order against Miller-Petetan. The court explained O'Brien's fear of her grandsons and her practice of calling the police when he played the drums were "just not enough to issue a restraining order."

The trial court also denied O'Brien's petitions for restraining orders against the LaDrews. The court "recognize[d] that the burden of proof . . . [is] by a preponderance of the evidence, and even with that, [the court] [did] not find that [O'Brien] . . . sustained those burdens." The trial court emphasized it did "not find [O'Brien] to be a credible witness." "In particular, [O'Brien] [did not] understand that when [he was] threatening people, that [he was], in fact, threatening people."

The trial court granted Miller-Petetan and Margo's petitions for restraining orders against O'Brien. Among other things, the restraining orders the court issued require O'Brien to stay away from Miller-Petetan and the LaDrews and prohibit him from harassing or contacting them. The orders the court issued do not include any restriction on playing musical instruments. At the restraining order hearing, the trial court explained it could not bar O'Brien from playing all musical instruments but stated he "must play in such a manner so as not to be heard by the next-door neighbors. So he can play them, but he has to do something to—I don't know—soundproof your home or maybe play some other type of instrument or play it in such— whatever you have to do so that the neighbors don't hear you."

*D. Appeal*

O'Brien noticed appeals from the trial court's orders granting Margo and Miller-Petetan's petitions and denying his petitions. O'Brien's appeals from the orders denying his petitions for restraining orders against Margo and Miller-Petetan were dismissed in 2022. We ordered the three remaining appeals consolidated for briefing, argument, and decision.

## II. DISCUSSION

O'Brien challenges the trial court's exclusion of his significant other's testimony and argues the trial court should have granted his petition for a restraining order against Lawrence. Neither argument, however, warrants reversal. Even if we assume the trial court erred in excluding O'Brien's partner's testimony, it is not probable that this testimony would have changed the trial court's rulings. O'Brien's contentions concerning his petition for a restraining order against Lawrence, i.e., that the trial court should have required Lawrence to disprove O'Brien's allegations of abuse and that the court actually did find O'Brien had carried his burden of proof, are wrong on the law and the facts, respectively.[3]

---

[3] O'Brien also suggests the restraining orders granted in favor of Miller-Petetan and the LaDrews include unconstitutional restrictions on his speech rights. Specifically, O'Brien objects to the trial court's remarks suggesting he cannot play the drums such that they are audible to Miller-Petetan or the LaDrews. Because the written orders do not include any restriction on O'Brien's drumming, the remarks do not provide a basis for reversal. (See CALCRIM No. 2701.)

8

### A. O'Brien's Motion to Strike Miller-Petetan and the LaDrews' Respondents' Brief

Preliminarily, O'Brien moves to strike Miller-Petetan and the LaDrews' respondents' brief because it does not include any citations to the record or relevant authority, discusses matters outside the record, and includes irrelevant and allegedly defamatory statements. Although we deny O'Brien's motion to strike Miller-Petetan and the LaDrews' brief, we disregard statements of fact that are not supported by citations to the record. (Cal. Rules of Court, rule 8.204(a)(1)(C).)

### B. The Trial Court's Exclusion of Testimony from O'Brien's Significant Other Did Not Prejudice O'Brien

Evidence Code section 352 states that "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Pursuant to this statute, "a trial court has broad discretion to exclude evidence it deems irrelevant, cumulative, or unduly prejudicial or time-consuming.' [Citations.]" (*People v. Johnson* (2022) 12 Cal.5th 544, 605.) Even when the trial court abuses this discretion, "[the] court's error in excluding evidence is grounds for reversal only if the appellant demonstrates a miscarriage of justice, that is, that a different result would have been probable had the error not occurred." (*Major v. R.J. Reynolds Tobacco Co.* (2017) 14 Cal.App.5th 1179, 1202.)

Assuming for argument's sake that the testimony O'Brien wanted to elicit would not have been cumulative and that

9

O'Brien's rather perfunctory proffer at the hearing constitutes a sufficient offer of proof (Evid. Code, § 354, subd. (a)), it still is not reasonably probable that allowing the testimony would have yielded a different result.

With respect to Miller-Petetan and Margo's petitions, the trial court emphasized O'Brien admitted to harassing and threatening conduct but lacked the insight to recognize it as such. Testimony from O'Brien's significant other would not have changed that. She could not have meaningfully contradicted his concessions to having told Miller-Petetan she "[did not] know who she [was] fucking with" and told Lawrence that he was "going to be going with [O'Brien]" when O'Brien died.

With respect to O'Brien's petition for a restraining order against Lawrence, O'Brien's significant other's testimony presumably would have corroborated his own claims of harassing and threatening conduct. We similarly conclude such testimony is not reasonably likely to have changed the outcome. O'Brien's own testimony suggested his significant other was not present for several of the incidents he described; he said he was talking to Margo when Lawrence purportedly "ran up" with a gun, and he conceded "no one else" was there when Lawrence purportedly said he would "catch [his] ass." Moreover, other asserted threats, e.g., that O'Brien "would be kidnapped and all this and that," were so lacking in detail that corroborative testimony by O'Brien's significant other would have had little probative value.

O'Brien alternatively contends that "[i]f the court wasn't going to let" his significant other testify, it should have permitted her to be "inside with [him] as [his] 'support person'" under Welfare and Institutions Code section 15657.03, subdivision (j). That statute does not, however, entitle an elder or dependent

10

adult seeking a restraining order to any *specific* support person, and the trial court has discretion to exclude potential witnesses. (Evid. Code, § 777.)  Because the basis of the trial court's order excluding O'Brien's significant other's testimony did not emerge until after O'Brien testified, the trial court did not abuse its discretion in excluding her from the courtroom earlier in the proceedings.

### C.     *The Trial Court Did Not Err in Denying O'Brien's Petition for a Restraining Order Against Lawrence*

Welfare and Institutions Code section 15657.03 governs the issuance of protective orders under the Elder Abuse and Dependent Adult Civil Protection Act (the Elder Abuse Act). (Welf. & Inst. Code, § 15600 et seq.)  An elder or dependent adult who has suffered abuse, including "physical abuse . . . or other treatment with resulting physical harm or pain or mental suffering," may seek a protective order.  (Welf. & Inst. Code, §§ 15657.03, subd. (a), 15610.07, subd. (a)(1).)  We review the trial court's ruling on a petition for a protective order under the Elder Abuse Act for abuse of discretion, and we review the court's underlying factual findings for substantial evidence.  (*White v. Wear* (2022) 76 Cal.App.5th 24, 35.)  "The level of proof required for a protective order under the Elder Abuse Act is a preponderance of the evidence.  [Citations.]"  (*Ibid.*)

O'Brien contends a restraining order against Lawrence should have issued because Lawrence failed to disprove his allegations of abuse and because the trial court supposedly found he had shown abuse by a preponderance of the evidence.  But the fact that Lawrence "provided no evidence that he has not harassed [O'Brien]" does not undermine the trial court's ruling;

11

*O'Brien* had the burden to prove he suffered abuse.[4]  (*Gdowski v. Gdowski* (2009) 175 Cal.App.4th 128, 138.)  O'Brien's claim that the trial court "stat[ed] that there was a preponderance of the evidence" is based on a misreading of the reporter's transcript. The trial court explained O'Brien had the burden to show abuse by a preponderance of the evidence and found that he failed to do so because his testimony was not credible.

The trial court's finding that O'Brien did not suffer abuse is supported by substantial evidence, and the trial court did not abuse its discretion in denying his petition for an elder abuse restraining order against Lawrence.

---

[4]  O'Brien's related suggestion that the trial court improperly "advocated" that Lawrence should generally deny O'Brien's allegations is baseless.  The trial court characterized Lawrence's brief testimony as a general denial, and Lawrence agreed.

DISPOSITION

The trial court's orders granting Miller-Petetan and Margo's petitions for restraining orders against O'Brien and denying O'Brien's petition for a restraining order against Lawrence are affirmed. Miller-Petetan and the LaDrews are awarded costs on appeal.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


BAKER, Acting P. J.

We concur:



MOOR, J.



LEE, J.[*]

---

[*] Judge of the San Bernardino County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.