[No. G040975. Fourth Dist., Div. Three. June 23, 2009.]

MICHAEL GDOWSKI, Plaintiff and Respondent, v.
DIANA GDOWSKI, Defendant and Appellant.

**COUNSEL**

Cox, Castle & Nicholson and Stanley W. Lamport for Defendant and Appellant.

Law Offices of Marjorie G. Fuller, Marjorie G. Fuller and Lisa R. Wiley for Plaintiff and Respondent.

**OPINION**

**FYBEL, J.—**

### INTRODUCTION

After an evidentiary hearing, the trial court issued a protective order under the Elder Abuse and Dependent Adult Civil Protection Act (Welf. & Inst. Code, § 15600 et seq.) (Elder Abuse Act), prohibiting Diana Gdowski from contacting, striking, or otherwise abusing her 83-year-old father, Michael Gdowski, and requiring her to stay away from his residence.[1]

Diana argues the trial court erred by issuing the protective order because no evidence was presented that Diana posed an immediate threat of future abuse against Michael. We hold a protective order under the Elder Abuse Act may be issued on the basis of evidence of past abuse, without any particularized showing that the wrongful acts will be continued or repeated.

■ Diana also contends that the trial court abused its discretion in issuing the protective order. The court stated that its decision was "tipp[ed]" by Diana's counsel's aggressive and confrontational cross-examination of Michael, which the court assumed was consistent with Diana's desires. Counsel's tone of voice or style of examination is not evidence, and cannot be the basis for the issuance of a protective order under the Elder Abuse Act. We conclude the trial court erred in issuing the order, and therefore reverse.

---

[1] Because the parties share the same last name, we will refer to them by their first names to avoid confusion; we intend no disrespect.

STATEMENT OF FACTS

### A. *Michael Files a Request for a Protective Order, and Diana Responds*

On June 12, 2008, 83-year-old Michael filed a request for a protective order against his adult daughter, 56-year-old Diana, pursuant to Welfare and Institutions Code section 15657.03. In a declaration attached to his request, Michael claimed Diana had physically and emotionally abused him, and had caused caregivers for 88-year-old Frances Gdowski, Michael's wife and Diana's mother, to quit. Specifically, Michael claimed Diana had punched him on six occasions between October 2007 and February 2008. Michael also stated that Diana had yelled at him several times during March 2008, causing Frances to cry. Michael and his other daughter, Sandra Schulz, disagreed with Diana regarding Frances's medical care. Michael declared that Frances's caregiver had quit because Diana's harassment and threats were causing the caregiver too much stress. (Michael also made numerous hearsay statements about Diana's threats to kidnap Frances and take her to Italy, her desire that Michael and Schulz were dead, and references to her lawyer's friends in the Mafia.) Based on Michael's declaration, a temporary restraining order was issued against Diana on that same day, without notice or a hearing.

Diana filed a written response to Michael's request for a protective order on July 22, 2008. In a declaration attached to the response, Diana denied punching or striking Michael, stating she wished Michael and Sandra would die, threatening to kidnap Frances, or having a lawyer with friends in the Mafia. Diana claimed Michael did not want to spend money on Frances and feared losing control of Frances's share of their community property. Diana admitted she would support the assignment of a professional third party to manage Michael and Frances's estate, but denied trying to declare Michael incompetent so she could take over the estate. Diana contended Michael and Schulz had neglected Frances's medical needs, causing Frances to be in constant pain. Diana also claimed that, since October 2007, Michael had told her many times that as far as he was concerned Frances was dead, she was no longer of any use to him, he no longer had a wife, she was not worth spending money on, and their money would be better spent invested in the stock market.

### B. *The Hearing*

An evidentiary hearing was conducted on July 23, 2008. Michael and Diana testified. Michael admitted he had filed a petition to be appointed conservator for Frances. He was seeking a protective order against Diana because of "[t]hreat of bodily harm, and threats of kidnapping. And stabilizes

[*sic*] the family." Michael testified Diana had struck his back with her fists in February or March 2008. Michael said this was the first time Diana had hit him, and it occurred "spontaneously" and not in response to an argument. Michael and Diana were always having disagreements, during which Diana would get excited and scream at him; Michael claimed his hearing problems were the result of Diana screaming "right up close to my ear." Michael also testified Diana created confusion and disrupted the order of the household. A full-time caregiver provided care for Frances. Michael testified two caregivers had quit, although no testimony was offered for the reasons they left. Michael felt Diana posed a threat to the health and safety of himself, Frances, and other members of his family.

On cross-examination, Michael admitted he reported the February or March 2008 incident of physical abuse only after he had filed a petition in the probate court to be appointed Frances's conservator. Michael also testified on cross-examination that, although he had only identified one incident of physical abuse on direct examination, there were actually multiple incidents; Michael did not provide any testimony as to the nature or timing of those other incidents.

Diana testified she had never struck Michael, and they had never had "heated" arguments. Diana claimed she and her father agreed about everything other than his investments and the care to be provided for Frances. Diana had concerns about Frances's welfare, objected to Michael's conservatorship petition, and filed her own petition asking that a professional conservator be appointed. Before the temporary restraining order was issued, Diana had almost daily contact with Frances, and made her dinner every night. Diana denied ever threatening Michael or suggesting to anyone she would harm him. Diana testified that when she expressed her belief that the money Michael was investing should be used to provide care for Frances, Michael replied, "he didn't have a wife any more," and Frances "was not worth spending any money on." Diana believed Michael's investments were very risky because too much of his and Frances's portfolio was tied up in oil, gas, and gold, and because he traded on margin. Diana testified Frances's former caregiver quit because caring for Frances was too physically demanding, and the caregiver "was not happy about the situation there." Diana claimed that Michael's hearing loss was due to his age, diet, and circulatory problems, not to her yelling at him.

### C. *The Trial Court's Ruling*

After the parties completed their testimony, the trial court made the following ruling:

"The Court: [¶] . . . [¶] What I have here, is simply a rather close call. It's one person's word against the other. The court has observed carefully the demeanor of this process. Frankly, the court is affected by the manner in which [Michael] was examined, and that [Diana] allowed that to happen.

"[Counsel for Diana],[2] I assume that your rather aggressive and confrontational cross-examination of [Michael] was consistent with your client's desire to treat her father in such a fashion.

"[Diana's counsel]: That is an unfair characterization.

"The Court: I'm speaking, counsel. I'm the one that sat and watched you beat up on this fellow. And speak to him in such a way.

"There is a problem here. It's an elderly man that is having difficulty. His wife is disabled, and in need of a conservatorship. He has concern about her. He has come to this court to ask for relief.

"What he has got in response is an allegation that he is a bad person, and in some fashion that he is out for some evil motive and that he does not have the best interest of his wife.

"The examination of him I think was abusive to him. We're in a court of families that go through these difficult times. And they need to be treated with respect.

"And I compared that to how [Michael's counsel] cross examined [Diana]. With respect, without raising his voice, without being confrontational.

"This is a family in trouble. It's not a war we're fighting . . . in this courtroom. This is a family. *The court observed that happening and your client didn't tap you on the shoulder and say to you this is my father you are speaking to. That was the straw that made the difference in tipping the scale as to whether or not [Michael] has been treated in an abusive way.* [¶] . . . [¶]

". . . The Elder [Abuse] statute provides that causing emotional distress or mental suffering to an elder person is elder abuse. So it's not the same as domestic violence, where you have to hit, where you have to commit something equivalent to a crime in order to have a restraining order issued.

"We treat our elderly with respect. We don't yell at them, we don't treat them rudely, we don't tell them I have a right to come in your house whether or not you want me here or not. They have rights. [¶] . . . [¶]

---

[2] Diana's appellate counsel was not her trial counsel.

"So it's a very close call. I can only judge it on a preponderance of the evidence. Has [Michael] been yelled at, treated rudely, to the point that would cause him emotional [di]stress or mental suffering? Pursuant to the elder abuse statutes the court believes that he has.

"I don't have an opinion as to whether he's been hit or how many times he might have been hit. I'm not making a finding on that. But I'm quite sure that he's been treated in an abusive fashion on an emotional level.

"And on that basis the court will grant the order that [Diana] will not contact, molest, attack, strike, threaten or assault or otherwise disturb the peace of [Michael]. She is to stay 100 yards away from his place of residence and . . . his automobile." (Italics added.)

The court issued the protective order on July 23, 2008. The order expires on July 23, 2009. Diana timely appealed.

DISCUSSION

### A.  Standard of Review

We review the issuance of a protective order under the Elder Abuse Act for abuse of discretion, and we review the factual findings necessary to support the protective order for substantial evidence. (*Bookout v. Nielsen* (2007) 155 Cal.App.4th 1131, 1137 [67 Cal.Rptr.3d 2].)

### B.  A Protective Order May Issue Under the Elder Abuse Act Without a Showing of a Threat of Future Abuse

Diana argues the trial court erred in issuing the protective order because there was no threat of ongoing abuse. Diana cites *Scripps Health v. Marin* (1999) 72 Cal.App.4th 324 [85 Cal.Rptr.2d 86], in which the appellate court held a restraining order had been improperly issued under Code of Civil Procedure section 527.8 because, at the time the order issued, there was no threat of future harm by the restrained party.

In *Scripps Health v. Marin, supra,* 72 Cal.App.4th at page 327, the court analyzed Code of Civil Procedure section 527.8, and explained: "[I]n enacting section 527.8 the Legislature did not intend to alter the underlying nature and purpose of a prohibitory injunction and when such relief is accorded. Thus, to obtain a permanent injunction under section 527.8, subdivision (f), plaintiff must establish not only that defendant engaged in unlawful violence or made a credible threat of violence, but also that great or irreparable harm

would result to an employee without issuance of the prohibitory injunction. Because the record lacks any evidence that Marin posed a threat of future harm to any Scripps Health employee, we accordingly reverse the order." The court held: "[T]he express codified purpose of a prohibitory injunction is to prevent future harm to the applicant by ordering the defendant to refrain from doing a particular act. [Citations.] Consequently, injunctive relief lies only to prevent threatened injury and has no application to wrongs that have been completed. [Citation.] It should neither serve as punishment for past acts, nor be exercised in the absence of any evidence establishing the reasonable probability the acts will be repeated in the future. Indeed, a change in circumstances at the time of the hearing, rendering injunctive relief moot or unnecessary, justifies denial of the request. [Citations.] Moreover, not only can injunctive relief be denied where the defendant has voluntarily discontinued the wrongful conduct [citation], there exists no equitable reason for ordering it where the defendant has in good faith discontinued the proscribed conduct [citation]. 'Thus, to authorize the issuance of an injunction, it must appear with reasonable certainty that the wrongful acts will be continued or repeated.' [Citation.]" (*Scripps Health v. Marin, supra*, 72 Cal.App.4th at pp. 332–333.)

Michael argues Code of Civil Procedure section 527.8, subdivision (f), under which the restraining order in *Scripps Health v. Marin* was issued, is specific to workplace violence and threats, and requires a "very different" showing from that required for issuance of a protective order under the Elder Abuse Act. Code of Civil Procedure section 527.8, subdivision (f) provides, in relevant part: "If the judge finds by clear and convincing evidence that the defendant engaged in unlawful violence or made a credible threat of violence, an injunction shall issue prohibiting further unlawful violence or threats of violence."

■ In contrast, the relevant language regarding issuance of a protective order under the Elder Abuse Act reads as follows: "An order may be issued under this section, with or without notice, to restrain any person for the purpose of preventing a recurrence of abuse, if an affidavit *shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse of the petitioning elder or dependent adult.*" (Welf. & Inst. Code, § 15657.03, subd. (c), italics added.) The legislation enacting Welfare and Institutions Code section 15657.03, and thus creating the right to seek a protective order to prevent elder abuse, was intended to "set forth procedures under which an elder or dependent adult in immediate and present danger of abuse may seek protective orders." (Legis. Counsel's Dig., Assem. Bill No. 59 (1999–2000 Reg. Sess.); see Stats. 1999, ch. 561, § 6.) Diana correctly notes that by permitting a court to issue a protective order for the "purpose of preventing a recurrence of abuse," the statute presupposes abuse has occurred in the past.

Family Code section 6300, part of the Domestic Violence Prevention Act (Fam. Code, § 6200 et seq.) (DVPA), uses language which is almost identical to that in Welfare and Institutions Code section 15657.03, and is therefore more useful to our analysis than Code of Civil Procedure section 527.8: "An order may be issued under this part, with or without notice, to restrain any person for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved, if an affidavit or, if necessary, an affidavit and any additional information provided to the court pursuant to Section 6306, *shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse."* (Fam. Code, § 6300, italics added.)

■ Both Family Code section 6300 and Welfare and Institutions Code section 15657.03 require a showing of past abuse, not a threat of future harm. Family Code section 6300 has been interpreted to permit a trial court "to issue a protective order under the DVPA simply on the basis of an affidavit showing past abuse." (*Nakamura v. Parker* (2007) 156 Cal.App.4th 327, 334 [67 Cal.Rptr.3d 286].) The DVPA and the Elder Abuse Act therefore permit issuance of protective orders on a different, broader basis than permitted under Code of Civil Procedure sections 527.6 and 527.8. (*Nakamura v. Parker, supra,* 156 Cal.App.4th at p. 334.) Additionally, a lower level of proof is required for issuance of a protective order under the DVPA and the Elder Abuse Act—a preponderance of the evidence, rather than clear and convincing evidence. (*Nakamura v. Parker, supra,* 156 Cal.App.4th at p. 334; *Bookout v. Nielsen, supra,* 155 Cal.App.4th at p. 1138.)

■ We hold that a protective order under the Elder Abuse Act may issue on the basis of evidence of past abuse, without any particularized showing that the wrongful acts will be continued or repeated. This holding is consistent with the language, legislative intent, and history of the Elder Abuse Act in general (Welf. & Inst. Code, § 15600; Stats. 1982, ch. 1184, § 3, p. 4223), and Welfare and Institutions Code section 15657.03 in particular (Stats. 1999, ch. 561, § 6).

### C. *The Trial Court Erred by Basing Its Decision on Counsel's Conduct, Rather Than on the Evidence*

Diana argues the trial court abused its discretion in issuing the protective order because its findings were not based on substantial evidence. She argues the trial court instead based its findings on her counsel's behavior, and her alleged failure to control that behavior. Diana's argument has merit. The trial court stated on the record that "the straw that made the difference in tipping the scale as to whether or not [Michael] has been treated in an abusive way" was the manner in which Diana's counsel questioned Michael and Diana's failure to stop such questioning. As we shall explain, to make a ruling on this basis is reversible error.

■ Michael bore the burden of establishing his case by a preponderance of the evidence. (*Bookout v. Nielsen, supra,* 155 Cal.App.4th at p. 1138.) In effect, the trial court found the evidence was evenly balanced when it announced counsel's behavior in court and Diana's failure to control that behavior were "the straw that . . . tipp[ed] the scale." Under these circumstances, we must conclude Michael failed to meet his burden of proof, and reverse. (*Tuttle v. Crawford* (1936) 8 Cal.2d 126, 134 [63 P.2d 1128].)[3]

We recognize that the trial court later stated it believed, on a preponderance of the evidence, Michael had been "yelled at, treated rudely, to the point that would cause him emotional [di]stress or mental suffering." That sentence sets forth the court's conclusion, but we are focused on *why* the court reached its conclusion. We cannot close our eyes to, and disregard, the trial court's express acknowledgement that the attorney's questioning and Diana's failure to intervene were "the straw that made the difference" in reaching its conclusion.

■ Because Diana was represented by counsel, she was not able to appear in her own behalf in court, or control the court proceedings. (*People v. Merkouris* (1956) 46 Cal.2d 540, 554–555 [297 P.2d 999].) "An attorney has the right to control matters of ordinary trial strategy, such as whether a particular witness should be called, whether certain evidence should be introduced, and whether an evidentiary objection should be interposed. [Citation.]" (*In re Kerry O.* (1989) 210 Cal.App.3d 326, 333 [258 Cal.Rptr. 448]; see *People v. Frierson* (1985) 39 Cal.3d 803, 813 [218 Cal.Rptr. 73, 705 P.2d 396].) The manner in which cross-examination will be conducted is another matter of trial strategy which is within the control of counsel. Additionally, because the attorney-client relationship is a fiduciary one, the client properly cedes to his or her counsel the right to act in a manner that will protect the client's best interests. (See *Beery v. State Bar* (1987) 43 Cal.3d 802, 813 [239 Cal.Rptr. 121, 739 P.2d 1289].) To require a client to correct his or her counsel's behavior *during* the examination of a witness in order to avoid inferences as to the client's prior actions outside the courtroom would go against all these accepted principles of the attorney-client relationship.

■ Evidence Code section 140 defines evidence: " 'Evidence' means testimony, writings, material objects, or other things presented to the senses

---

[3] In *Whyte v. Schlage Lock Co.* (2002) 101 Cal.App.4th 1443, 1451 [125 Cal.Rptr.2d 277], a panel of this court held, "[b]ecause we review the correctness of the order, and not the court's reasons, we will not consider the court's oral comments or use them to undermine the order ultimately entered. [Citations.]" Although neither party raised this rule in the briefs or at oral argument, we note that the present case is distinguishable. Here, we consider the trial court's oral comments to determine the trial court based its decision on a ground that a court cannot consider—the manner of counsel's cross-examination and the client's failure to try to stop that examination.

that are offered to prove the existence or nonexistence of a fact." Statements and arguments by counsel are not evidence. (*People v. Richardson* (2008) 43 Cal.4th 959, 1004 [77 Cal.Rptr.3d 163, 183 P.3d 1146]; *People v. Lucas* (1995) 12 Cal.4th 415, 474 [48 Cal.Rptr.2d 525, 907 P.2d 373].) Therefore, Diana's counsel's questions of Michael could not have been evidence on which the trial court could rely.

Michael argues the trial court's comments were "mere advisory language" which should be treated as "superfluous." Michael relies on Civil Code section 3537, which provides: "Superfluity does not vitiate." In this case, on this record, the trial court's explanation of its decision was not superfluous. Instead, the court's decision was demonstrably based on an impermissible reason, namely, the manner of Diana's counsel's cross-examination and Diana's failure to intervene. As we will explain, the cases Michael cites in support of his position are all inapposite.

In *Warden v. Gries* (1932) 120 Cal.App. 187, 188 [7 P.2d 342], the appellants purported to hold a deed to property and sought to quiet title against the respondents. The trial court determined that the deed by which the appellants claimed an interest in the property was void because it was not issued in compliance with the law. (*Id.* at pp. 188–189.) The appellate court did not consider the appellants' challenge to several of the trial court's findings, because two findings, which were supported by the evidence, were sufficient to affirm the judgment. (*Id.* at p. 189.) The appellate court held: "Where, as here, the trial court has made findings of fact which are necessarily decisive of the case, the fact that other findings are made, not in any way inconsistent with the findings which dispose of the case, is wholly immaterial and will be disregarded." (*Ibid.*) In the present case, we are not considering whether some of the trial court's findings would support the issuance of the protective order, while others would not. The question here is whether the trial court's acknowledgement that its decision was tipped by the in-court conduct of the client and her counsel constitutes an abuse of discretion in the issuance of the protective order.

*San Diego Housing Com. v. Industrial Indemnity Co.* (2002) 95 Cal.App.4th 669, 673 [116 Cal.Rptr.2d 103] (*San Diego Housing*), involved claims under an insurance policy, based on an underlying construction defect case. A judgment following a jury trial was reversed, and the case was remanded for retrial. (*Ibid.*) In the second trial, the jury rendered an advisory verdict on the duty to defend. (*Id.* at p. 677.) The judgment stated, in part: " 'Two juries have found that defendant . . . had a duty to defend the insured . . . in the underlying lawsuit filed by plaintiffs . . . , decisions with which this Court agrees.' " (*Ibid.*) The appellate court noted, "[w]e review the judgment, not the trial court's reasoning. [Citation.] The reference to the prior jury's finding

is merely superfluous. 'Superfluity does not vitiate.' [Citation.]" (*Id.* at fn. 8.) The trial court's reference in the present case to its reliance on counsel's conduct as a determining factor in a close case is a far cry from the *San Diego Housing* court's reference to the advisory findings of a jury in an earlier case, especially when the trial court in *San Diego Housing* was also properly relying on the advisory findings of the second jury.

The appellate court in *San Diego Housing* relied on *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10], in which the Supreme Court held that an order granting summary judgment on an incorrect legal ground must be affirmed if it is correct based on any legal theory in the case. Neither *San Diego Housing* nor the case it cites is on point.

In *Glendale City Employees' Assn., Inc. v. City of Glendale* (1975) 15 Cal.3d 328, 333 [124 Cal.Rptr. 513, 540 P.2d 609], the city employees' association and some of its individual members sued the city for failure to properly calculate salary ranges for city employees under a salary ordinance. The trial court concluded the city's calculation failed to comply with a memorandum of understanding between the employees' association and the city council. (*Id.* at pp. 333–334.) On appeal, the city argued the plaintiffs had failed to provide adequate notice to the members of the class of city employees the plaintiffs purported to represent. (*Id.* at p. 341.) The appellate court concluded the complaint's allegations of class action status and the trial court's findings regarding notice to the class were superfluous, because the employees' association had the right to sue in its own name to enforce the memorandum of understanding. (*Ibid.*) "[T]he unnecessary allegations and findings that the suit is a class action do not detract from the merits of plaintiff association's suit as the recognized representative of the city employees. 'Superfluity does not vitiate.' [Citation.]" (*Id.* at pp. 341–342.) In this case, the trial court's clear statement on the record that the factors tipping its decision were the manner in which Diana's counsel conducted cross-examination of Michael, and Diana's failure to try to stop it, is not an unnecessary allegation or finding that does not detract from the merits of the action.

We agree with the trial court's expression of the state's policy against elder abuse and the reasons therefor. We do not doubt the trial court's assessment that Diana's counsel was "aggressive and confrontational" in cross-examining Michael. We presume it was counsel's tone of voice that the court found offensive, for there is nothing on the dry pages of the appellate record that shows the questions asked were in any way argumentative or inappropriate. And we note that Michael's counsel did not object to any of the questions asked as argumentative, or argue to the court that Diana's counsel was in any way acting inappropriately.

## Disposition

The order is reversed. Respondent to recover costs on appeal.

Sills, P. J., and Ikola, J., concurred.