Filed 9/30/13  Tri-City Healtcare Dist. v. Sterling CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| TRI-CITY HEALTHCARE DISTRICT,<br><br>  Plaintiff and Appellant,<br><br>  v.<br><br>KATHLEEN STERLING,<br><br>  Defendant and Appellant. | Consolidated Cases<br>D059810, D059812, D059813,<br>D059814, D059815, D059816,<br>D060490<br><br>(Super. Ct. Nos.<br> 37-2011-00052101-CU-PT-NC,<br> 37-2011-00052069-CU-PT-NC,<br> 37-2011-00052102-CU-PT-NC,<br> 37-2011-00052103-CU-PT-NC,<br> 37-2011-00052104-CU-PT-NC,<br> 37-2011-00052114-CU-PT-NC,<br> 37-2011-00052112-CU-PT-NC) |

APPEALS from orders of the Superior Court of San Diego County, Richard E. Mills, Judge.  Affirmed.

Daley & Heft, Mitchell D. Dean, Scott Noya and Lee H. Roistacher; Horvitz & Levy, David S. Ettinger, Mitchell C. Tilner and Jeremy B. Rosen; Procopio, Cory Hargreaves & Savitch, Evelyn F. Heidelberg and Gregory V. Moser, for Plaintiff and Appellant Tri-City Healthcare District.

Spiegel Liao & Kagay and Charles M. Kagay; The McMillan Law Firm, Scott A. McMillan and Evan Kalooky for Defendant and Appellant Kathleen Sterling.

Tri-City Healthcare District (Tri-City) petitioned for protective orders against Kathleen Sterling, an elected Tri-City board member, alleging the protective orders were necessary to prevent Sterling from committing workplace violence against specified individuals. (Code Civ. Proc.,[1] § 527.8.) After a four-day evidentiary hearing, the court denied the petitions, finding Tri-City did not meet its burden to satisfy the required statutory elements for the protective orders. The court later denied Sterling's attorney fees motion brought under the private attorney general statute. (§ 1021.5.)

Both parties appeal. Challenging the denial of its section 527.8 petitions, Tri-City contends the court applied incorrect legal standards and erred in sustaining Sterling's hearsay objection to a security officer's written report. We find no prejudicial error and affirm the court's orders. In her cross-appeal, Sterling contends the court erred in denying her attorney fees motion because her successful defense of the petitions vindicated an important right affecting the public interest and conferred a substantial benefit on the general public. We determine the court properly applied applicable law and did not abuse its discretion in rejecting these arguments.

---

[1] Statutory references are to the Code of Civil Procedure, unless otherwise specified.

2

FACTUAL AND PROCEDURAL SUMMARY

*Background*

Tri-City is a subdivision of the state and operates a hospital in Oceanside. The hospital is governed by a publicly elected board of directors (the Board). At all relevant times, Sterling was an elected member of the Board.

In March 2011, Tri-City filed section 527.8 petitions seeking to enjoin Sterling from having any further contact with eight specified individuals, alleging Sterling had a history of disruptive behavior and her conduct had recently escalated to include physical assaults on Tri-City security personnel at a Board meeting. The eight individuals were: (1) Tri-City's independent security officer Richard Crooks; (2) Tri-City's chief executive officer Larry Anderson; (3) Tri-City's in-house counsel Matthew Soskins; and (4) five Board members: RoseMarie Reno, Charlene Anderson, George Coulter, Dan Stein, and Alexander Yu. Tri-City later withdrew the petitions for Board members Stein and Yu. We shall refer to the six remaining individuals as petitioners.

Shortly after granting temporary restraining orders, the court held an evidentiary hearing on Tri-City's request for permanent (three-year) restraining orders. During the hearing, Tri-City presented the testimony of the six petitioners and one other percipient witness. Although Tri-City's director of security (Craig Lawyer) claimed to have been injured by Sterling's conduct, Tri-City did not call him to testify. In her defense, Sterling testified at length and also called various character witnesses and a private investigator who witnessed some of the relevant events.

3

The following summarizes the evidence presented at the section 527.8 hearing. Except where the trial court indicated otherwise, we view the relevant evidence in the light most favorable to the prevailing party (Sterling) and assume all credibility disputes were resolved in Sterling's favor. (*USS-Posco Industries v. Edwards* (2003) 111 Cal.App.4th 436, 444 (*USS-Posco*).) When relevant to the prejudice analysis, we will include a discussion of the evidence presented by Tri-City.[2]

*Events Before February 24, 2011 Board Meeting*

During 2009 and 2010, Sterling had numerous disagreements with other Board members on a variety of topics related to hospital governance issues and would often express herself in a loud, obnoxious, and disagreeable fashion. To prevent this behavior from continuing, the Board imposed a series of censures and sanctions on Sterling that ultimately required her to participate in Board meetings through telephonic means while located in a separate room in a different part of the hospital. Although the issue of the propriety of these sanctions was not before the court in the section 527.8 hearing, we

---

[2]     In its appellate briefs, Tri-City summarizes the evidence in the light most favorable to its own factual presentation, despite that the court found much of this evidence to be unreliable or "trivial and inconsequential." Tri-City argues this factual summary is appropriate because it is not challenging the sufficiency of the evidence and instead is seeking to establish prejudicial or legal error. Although we agree that prejudicial error analysis requires a review of the entire record, we find Tri-City's approach of highlighting *only* its own evidence to be unhelpful and arguably misleading.

briefly describe the sanctions here because they are relevant to understand the events leading to Tri-City's filing of the petitions.[3]

In December 2010, the Board censured Sterling for her conduct at a prior Board meeting based on the Board's claims that she: (1) "engaged in a tug of war over the closing of the door with [another Board member]"; (2) called other directors a " 'bunch of F***ers' " and " 'Nazis' "; and (3) refused to leave the closed session after the Board determined she had a conflict of interest and could not participate. Although Sterling denied these allegations, the Board found the allegations true and that Sterling was "unprofessional, disruptive and violated the Board's standards and policies."

The next month, on January 27, 2011, the Board again voted to publicly censure Sterling for conduct at a prior Board meeting. This alleged conduct included Sterling interrupting colleagues without being properly recognized, falsely accusing her colleagues of Brown Act violations, and again referring to her colleagues as " 'Nazis.' " As a sanction for this claimed conduct, the Board adopted a rule barring Sterling from the Board room for three Board meetings, but provided that she could participate in Board meetings by using teleconference equipment in a different part of the building.

---

[3] During the section 527.8 hearing, the trial court made clear that in resolving the section 527.8 issues, it would assume the sanctions were proper and would not decide the validity of the sanctions. We likewise assume for purpose of this opinion *only* that the sanctions were proper. Nothing in this opinion should be interpreted to suggest that we agree the sanctions were legally valid.

*February 24, 2011 Board Meeting*

At the next Board meeting (February 24, 2011) two incidents occurred that formed the primary basis for Tri-City's section 527.8 petitions. Petitioners' testimony regarding these incidents was inconsistent and contradictory, and Sterling's testimony also conflicted with much of Tri-City's evidence. The court stated it found the testimony of petitioner Crooks (a private independent security officer retained by Tri-City to provide security at Board meetings) to be the most reliable, but it also credited various portions of Sterling's testimony. We summarize the relevant events based on the evidence found reliable by the court.

The February 24 Board meeting was scheduled to begin at 3:30 p.m. At about 3:25 p.m., Sterling attempted to enter the Board meeting room, believing the existing sanctions orders applied only during the meetings and not before the meetings. Security officer Crooks, however, believed the censure order barred Sterling from entering the room before and during the Board meetings. Based on that belief, Crooks and about three or four other security staff members (including Tri-City security director Craig Lawyer) blocked Sterling's entrance "in an attempt to impede her forward movement," forming a "kind of a curtain to prevent [Sterling] from entering." Sterling, who was loud and agitated and carrying a tape recorder, attempted to enter the room by walking around or pushing through these individuals. However, each time she tried to enter the room, the officers would move to block Sterling. Sterling denied that she hit anyone or bumped anyone with her body. After she was unable to enter the room, Sterling went back to the room with the telephonic equipment.

6

At the section 527.8 hearing, Crooks testified he did not believe Sterling was attempting to attack the security officers, and agreed that Sterling "was just trying to get to the other side" of the officers and into the room. When asked at the hearing whether anyone was injured, Crooks responded: "[Security director Lawyer] had blood on his . . . left sleeve of his dress shirt. . . . I don't know what specifically caused it, but he alleged the injury in my presence." Many other witnesses also testified about the blood on Lawyer's arm, but there was no other direct testimony as to what caused the blood.[4] Sterling denied that she had ever touched Lawyer's arm, but acknowledged that Lawyer claimed she was the cause of the blood.

After Sterling left the meeting hall, Soskins and Lawyer were laughing, saying they were going to have "fun" that night and calling Sterling a "crazy" woman. The Board meeting was then held, during which the Board adopted another censure resolution against Sterling.

About four hours after the first incident, a second incident occurred. At that time, the Board was about to meet in a closed session in a smaller room and Crooks was locking the door to the room. Sterling approached the door because she wanted to notify a Board administrative employee that her audiovisual equipment was no longer working and Sterling wanted to ensure she could view any visual presentations made at the closed session. Sterling testified that because she was unable to get the attention of the responsible individuals, she began yelling the names of the administrative employee and

---

4    The court sustained several hearsay objections to questions as to how this injury occurred.

the Board chair to ensure the equipment problem would be corrected before the closed session began.

According to Crooks's testimony, the meeting had not yet started when he was locking the door to the meeting room. Suddenly, Sterling's right arm came over his right shoulder. Sterling had a cell phone camera in her hand and was attempting to photograph the occupants in the closed meeting session. When Sterling's upper arm leaned against his back, Crooks twisted around and felt pain. Crooks later received treatment for a mild back strain.

At the section 527.8 hearing, Crooks testified that other than the two incidents on February 24, he had never observed Sterling to be physically aggressive and he had never seen anyone who was frightened of Sterling. Crooks had never heard Sterling make a threat to anyone. Crooks testified that he was not personally fearful of Sterling, but was concerned about the safety of other individuals at Tri-City and believed Sterling constitutes a threat of violence. Each of the other petitioners testified that based on Sterling's prior erratic and verbally abusive behavior, he or she was fearful of Sterling, and believed Sterling could or would physically harm them.

*Board Actions Responding to Sterling's February 24 Conduct*

Based on the two February 24 incidents, the Board imposed numerous additional sanctions on Sterling, including barring her "from the main Board room for the remainder of her term as Director" (through November 2012) and precluding her from receiving health care and other benefits generally made available to Board members. The Board also authorized its counsel to seek a restraining order "prohibiting . . . Sterling from

8

further retaliation against District employees." Less than two weeks later, on March 4, Tri-City filed the section 527.8 petitions at issue here.

*Court's Findings*

After the parties completed the presentation of the evidence (as summarized above), the court provided comments to guide counsel in their oral arguments. Of particular relevance here, the court stated that the only incident that came close to the "unlawful violence" necessary for the issuance of a section 527.8 protective order was the second February 24 incident, but that the court was having a hard time finding petitioners were fearful of Sterling or had an objective reason to be fearful and/or that Sterling posed a risk of continuing violence against petitioners.

Thereafter, counsel gave their closing arguments. Tri-City's counsel focused on Sterling's highly disruptive speech and conduct, asserting that "[Tri-City officials] have asked nicely [for her to refrain from disruptive activities] for years and not been heard. They stepped up to the point where they're implementing censures now because she won't listen any other way. The censures aren't working. She won't stop until she hurts someone. [¶] She has already proven that. She hurt Rick Crooks. He had two weeks of back pain and treatment to recover from that. Was that a serious injury? Probably not in the scheme of things. Was it a battery? Absolutely." Tri-City's counsel also argued: "This was, first we're going to censure you on this and we're going to say we're going to take away your dinner privileges. And then we're going to take away your parking privileges. And then it's going to be your education privileges. And to the point where they just said we have to ban you from the meeting because we can't control you."

9

During his closing arguments, Sterling's counsel asserted that the complaints against Sterling were largely political. He also argued that Tri-City had not met its statutory burden to prove that Sterling engaged in unlawful violence or a credible threat of violence, and/or that Sterling would likely engage in any such acts in the future. Counsel also urged the court to consider Sterling's testimony and conduct during the trial, during which she followed the court's rules, demonstrated self-control, and manifested no anger management problems.

After taking the matter under submission, the court ruled that Tri-City did not satisfy its burden to prove by clear and convincing evidence the necessity for the requested protective orders. Although neither party requested a statement of decision, the court provided oral comments to explain its reasoning. First, the court made clear that it understood it was required to follow the applicable law and summarized the law as follows:

> "[Tri-City] must show that Mrs. Sterling engaged in 'unlawful violence' or a 'credible threat of violence' towards [petitioners]. [¶] Unlawful violence is defined as assault or battery in violation of Penal Code sections 240 or 242. To be guilty of an assault, the defendant must willfully, which means on purpose, do an act that she was aware would result in touching another person in a harmful or offensive manner. To be guilty of a battery, the defendant, or respondent, technically, must willfully or on purpose touch another person in a harmful or offensive manner. The possible defenses to both crimes include accidental or inadvertent contact and contact as a result of self-defense.

> "The term 'credible threat of violence' is defined as a knowing and willful statement or course of conduct that could place a reasonable person in fear of his safety and that serves no legitimate purpose. 'Course of conduct' is defined as a pattern of conduct over or during any period of time or any amount of time.'

10

"Therefore, the question before the court is whether or not Sterling violated Penal Code section 240 or 242 and/or whether she made statements or engaged in a course of conduct that would cause a reasonable person to be in fear for his safety. . . . A broad definition of [fear] is that a person must fear something meaningful or significant as opposed to something trivial or unimportant."

Applying these principles to the evidence, the court found that Sterling did not engage in any conduct before the February 24 meeting that by itself would support the issuance of a section 527.8 protective order, and Tri-City presented no credible evidence that Sterling made any verbal threats "to anyone" at any time. The court explained that although "[s]ome of the language she used was perhaps undesirable or offensive, . . . there were no verbal threats either direct or indirect." The court also rejected Tri-City's arguments that Sterling had engaged in "escalating aggressive conduct" or that she had become " 'completely unhinged' " such that she no longer had control over her actions. The court stated there was "virtually no evidence" supporting any such claims.

The court then focused on the two February 24 incidents, and specifically whether Sterling's physical contact with Crooks during these incidents showed she had engaged in unlawful violence and would continue to do so without a protective order. In analyzing the first incident, the court found Sterling's conduct essentially constituted her attempt to walk around the security officers to enter the meeting room, and although there may have been some bumping by all parties, there was "absolutely no injury" from these contacts. The court also stated that it believed it important that Sterling arguably had a legal right to be in the room because the censure order referred to a prohibition *during* meetings. The court concluded: "At the very worst for Sterling she committed a battery on

11

petitioner Crooks. At the very best for Sterling, Crooks committed a battery on her. Neither person would be charged or convicted by any prosecuting agency in a criminal case. This court cannot find by a preponderance of the evidence that Sterling committed either an assault or a battery. *Her intention was clearly to get around the guards again before the meeting, not to come into contact with them.*" (Italics added.) The court also noted that "Lawyer did not testify. Various petitioners inferred that Sterling somehow caused his arm to bleed. There is absolutely no evidence in this trial to support that claim."

With respect to the second incident, the court stated: "[A]ccording to petitioner Crooks, who gave the most credible account of the event, Sterling stood behind him, reached over his shoulder and took a photo. She touched him enough that he became aware of her presence and instinctively pushed backwards and turned around. This turning action caused Sterling's weight to be on his back while it was twisted. This resulted in a minor muscle strain. [¶] The court does not believe there is proof by clear and convincing amount that an assault or battery took place. Sterling's goal was not to touch Crooks but to converse with Reno or with [her administrative assistant] about the T.V. and to take a photo. More likely than not, the touching was not even intentional but more likely careless."

TRI-CITY'S APPEAL

I. *Generally Applicable Legal Principles*

Section 527.8 "authoriz[es] any employer to pursue . . . an injunction on behalf of its employees to prevent threats or acts of violence by either another employee or third

12

person." (*Scripps Health v. Marin* (1999) 72 Cal.App.4th 324, 333 (*Scripps Health*).) The Legislature enacted the statute "to address the growing phenomenon in California of workplace violence by providing employers with injunctive relief so as to *prevent* such acts of workplace violence." (*Id.* at p. 334; accord, *Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal.App.4th 1228, 1258.)

Specifically, section 527.8 states: "Any employer, whose employee has suffered unlawful violence or a credible threat of violence from any individual, that can reasonably be construed to be carried out or to have been carried out at the workplace, may seek a temporary restraining order and an injunction on behalf of the employee and, at the discretion of the court, any number of other employees at the workplace . . . ." (§ 527.8, subd. (a).) At a section 527.8 hearing, the court shall "receive any testimony that is relevant and may make an independent inquiry." (§ 527.8, subd. (j).) "If the judge finds by clear and convincing evidence that the [defendant] engaged in unlawful violence or made a credible threat of violence, an injunction shall issue prohibiting further unlawful violence or threats of violence." (*Ibid.*) " 'Unlawful violence' is any assault or battery, or stalking . . . , but shall not include lawful acts of self-defense or defense of others." (§ 527.8, subd. (b)(7).) " 'Credible threat of violence' is a knowing and willful statement or course of conduct that would place a reasonable person in fear for his or her safety, or the safety of his or her immediate family, and that serves no legitimate purpose." (§ 527.8, subd. (b)(2).) A section 527.8 protective order must be limited to a three-year period and cannot be issued if it "prohibit[s] speech or other activities that are constitutionally protected . . . ." (§ 527.8, subds. (c), (k)(1).)

13

A trial court's "decision to grant a permanent injunction rests within its sound discretion and will not be disturbed on appeal absent a showing of a clear abuse of discretion." (*Shapiro v. San Diego City Council* (2002) 96 Cal.App.4th 904, 912.) When the trial court resolves disputed factual issues and draws inferences from the presented facts, an appellate court reviews the factual findings under a substantial evidence standard. (*Ibid.*; *USS-Posco, supra*, 111 Cal.App.4th at p. 444.)

## II. *Court Applied Correct Legal Standards*

Tri-City contends the court erred by applying incorrect legal standards. Specifically, Tri-City contends the court improperly: (1) imposed a requirement that Tri-City prove Sterling was likely to engage in unlawful violence *in the future*; (2) believed Sterling's intent was relevant to a battery finding; and (3) believed the issue whether criminal charges would be brought against Sterling was relevant to the battery analysis. As explained below, these contentions are without merit.

### A. *Likelihood of Future Improper Conduct*

More than 14 years ago, this court held a section 527.8 petitioning party "must establish by clear and convincing evidence not only that a defendant engaged in unlawful violence or made credible threats of violence, but also that . . . [there exists a] reasonable probability unlawful violence will occur in the future." (*Scripps Health, supra*, 72 Cal.App.4th at p. 335.) We explained that although this specific requirement is not expressly contained in the statutory language, "it is quite clear the Legislature intended to provide employers with the remedy of injunctive relief to protect their employees by preventing unlawful violence where it is reasonably likely such unlawful violence *may*

14

*occur in the future*." (*Ibid.*, italics added.) We reasoned that because the statute requires a showing of great or irreparable harm to obtain a temporary restraining order (§ 527.8, subd. (e)), the Legislature must have intended the same showing to obtain a permanent injunction. (*Scripps Health, supra*, at pp. 334-335.) We further found "no evidence of a legislative intent to alter the traditional nature of prohibitory injunctive relief" which generally requires a showing that the challenged conduct is reasonably likely to occur in the future. (*Id.* at p. 335; see *USS-Posco Industries*, *supra*, 111 Cal.App.4th at pp. 442-443.)

The court found Tri-City did not prove Sterling was likely to engage in future violent activities. Tri-City does not challenge the sufficiency of the evidence to support this finding, but requests that this court "re-examine" our *Scripps Health* holding that the likelihood of future violence is a required element for a section 527.8 protective order. We decline to do so. Numerous California courts have applied and/or expressed agreement with our statutory interpretation. (See *Russell v. Douvan* (2003) 112 Cal.App.4th 399, 401-404 [extending reasoning and conclusion to parallel section 527.6 protective orders]; *City of Los Angeles v. Animal Defense League* (2006) 135 Cal.App.4th 606, 615.) We continue to believe the analysis and reasoning of *Scripps Health* are sound and find no reason to depart from our holding.

In urging us to adopt a different rule, Tri-City relies on *Gdowski v. Gdowski* (2009) 175 Cal.App.4th 128. In *Gdowski*, the court held a protective order may issue under the Elder Abuse Act without evidence showing a threat of future abuse. (*Id.* at pp. 135-137; see Welf. & Inst. Code, § 15657.03.) In reaching this conclusion, the *Gdowski*

15

court recognized the *Scripps Health* court had adopted a different rule, but found the Elder Abuse Act permits "issuance of protective orders on a different, broader basis than permitted under . . . sections 527.6 and 527.8." (*Gdowski, supra,* 175 Cal.App.4th at p. 137.) Based on differences in the language and purpose of the statutes, the court found it appropriate to reach a different conclusion with respect to the Elder Abuse Act than was reached in *Scripps Health*. (*Gdowski, supra*, at pp. 136-137.) Because *Gdowski* interpreted a different statute, it does not support that we should abandon or alter our prior holding.

B. *Court Properly Applied Battery Law in its Unlawful Violence Analysis*

Tri-City next contends the court misapplied or misunderstood the legal definition of battery.[5]

Under section 527.8, a protective order shall issue if a defendant engaged in "unlawful violence." (§ 527.8, subd. (a).) " 'Unlawful violence' is any assault or battery . . . but shall not include lawful acts of self-defense or defense of others." (§ 527.8, subd. (b)(7).) A battery is defined as a "willful and unlawful use of force or violence upon the person of another." (Pen. Code, § 242.) An intent to harm is not an element of battery; all that is required is knowledge of the relevant facts and intent to do the act that is likely to, or does, result in the application of the wrongful force. (See

---

5      Sterling argues Tri-City waived this argument because it relies solely on the court's oral statements and never asked for a statement of decision. We exercise our discretion to address the argument on its merits. However, we necessarily examine the court's comments in the context in which they were made, as an informal explanation of the court's reasoning.

*People v. Colantuono* (1994) 7 Cal.4th 206, 218; *People v. Lara* (1996) 44 Cal.App.4th 102, 107-108.)

Relying on various statements made by the court when orally explaining its reasoning, Tri-City contends the court erroneously believed Sterling did not commit a battery because Sterling had a legal right to be in the Board meeting room during the first incident and/or because she did not specifically intend to harm Crooks.

This argument is not factually supported. In its oral comments, the court set forth the correct legal definition of battery and did not suggest it believed Sterling's right to be in the Board room or her subjective intentions legally precluded a finding that Sterling committed a battery. Reading the court's oral remarks as a whole and in context of its entire explanation, the court found these facts relevant primarily in evaluating whether the physical contact between Sterling and the Tri-City security guards was accidental or intentional. This analysis was appropriate. A touching by accident or as a result of reckless conduct is not a battery. (See *People v. Lara, supra*, 44 Cal.App.4th at pp. 107-108; see also *People v. Johnson* (1998) 67 Cal.App.4th 67, 72 & fn. 3.) The court's findings that Sterling reasonably believed she had a right to be in the Board room before the meeting and did not intend to harm anyone was relevant to the issue whether any touching or grabbing on her part was accidental or reckless, and thus was not a battery.

In any event, even assuming the court misapplied the law of battery and thus erred in concluding that Sterling's actions did not constitute "unlawful violence" under section 527.8, subdivisions (a)(1) and (b)(7), this error did not affect the court's additional conclusion that Tri-City did not establish by clear and convincing evidence the second

element necessary to obtain a section 527.8 protective order: that Sterling was likely to engage in similar conduct in the future. (See *Scripps Health, supra*, 72 Cal.App.4th at pp. 330-335.) Based on the court's implied findings that Sterling's physical contact with the officers was inadvertent and situational and a specific response to a particular set of circumstances unlikely to be repeated in the future, the court did not err in finding that even if the touching technically constituted a battery, it did not support the issuance of the requested protective orders under section 527.8.

C. *Issue Whether Sterling Would Be Criminally Charged for Her Acts*

Tri-City also contends the court erred by stating it was unlikely a prosecutor would have brought charges against Sterling for criminal battery under the circumstances. Viewed in context, this (likely accurate) observation reflects the court's conclusion that any touching was trivial and minor and was not significant in terms of showing violence or a threat of violence for purposes of justifying a protective order. The court's statement about whether criminal charges would be brought against Sterling does not show the court misapplied section 527.8 legal standards.

III. *Hearsay Evidence*

Tri-City additionally contends the court erred in sustaining a hearsay objection to a written report prepared by one of its security officers, Matthew Hernandez. We find no prejudicial error.

A. *Background*

During trial, Tri-City's counsel asked the court for permission to call one of its security employees, Hernandez, for the sole purpose of authenticating his written report

18

of the first February 24 incident. In the report, Hernandez discussed in great detail his first-hand observations of the incident, and also included statements made to him by the other security officers. Sterling's counsel objected to the report, stating that "I'm against hearsay statements being [admitted] . . . without the opportunity to cross-examine. If they want to go ahead and have [Hernandez] describe what he saw or experienced, that's fine. But as far as entering a police report, I mean, that's fundamental." In response, Tri-City's counsel acknowledged the report was hearsay, but argued it was admissible under the "official record" hearsay exception. The court found the exception inapplicable and sustained Sterling's hearsay objection.

Tri-City's counsel responded that she was not going to call Hernandez as a witness, stating: "If you're not going to admit the report then there's no reason to call him." At that point, the court noted "Let me just say: you can have as much time as you want. You can pursue whatever you want. But I have a pretty good idea what happened in Incident 1 and Incident 2. The record for any appeal that either of you might have is all there."

Several months after the trial court denied Tri-City's petitions, this court held that a trial court properly considered hearsay evidence in ruling on a section 527.8 petition. (*Kaiser Foundation Hospitals v. Wilson* (2011) 201 Cal.App.4th 550, 555-558 (*Kaiser Foundation*).) We reasoned that the statute's clear statement that the court shall consider "any testimony that is relevant" (§ 527.8, subd. (j)) shows that "the Legislature intended to permit a trial court to consider *all* relevant evidence, including hearsay evidence, when deciding whether to issue an injunction to prevent workplace violence pursuant to section

19

527.8."[6] (*Kaiser Foundation, supra*, at p. 557.) We also noted that section 527.8 hearings are "truncated" and "expedited" and a ruling may be "based on affidavits or declarations, which are themselves a form of hearsay evidence." (*Kaiser Foundation, supra*, at p. 557.) We additionally observed that a trial court, and not a jury, rules on a section 527.8 request under a clear and convincing proof standard, and "[t]rial judges are particularly aware of the potential unreliability of hearsay evidence, and are likely to keep this in mind when weighing all of the evidence presented." (*Kaiser Foundation, supra*, at p. 557.)

### B. *Legal Analysis*

Both parties recognize that under *Kaiser Foundation,* the trial court should not have excluded Hernandez's written report based solely on a hearsay objection. (*Kaiser Foundation, supra*, 201 Cal.App.4th at p. 558.) However, Sterling argues the error was waived and was not prejudicial. We agree.

First, Tri-City forfeited this appellate challenge because it did not seek to admit the report on the ground that hearsay evidence is permitted in section 527.8 hearings. To preserve an evidentiary contention for appeal, a party must have asserted the same specific ground in the trial court. (See Evid. Code, § 353; *People v. Alvarez* (1996) 14 Cal.4th 155, 186; see also *People v. Valdez* (2012) 55 Cal.4th 82, 130.) "The purpose of this rule is to give the trial court a concrete legal proposition to pass on, to give the

---

6    At the time the *Kaiser Foundation* decision was issued, this language was contained in section 527.8, subdivision (f).

opponent an opportunity to cure the defect, and to prevent abuse." (*People v. Holmes* (2012) 212 Cal.App.4th 431, 436; accord, *People v. Partida* (2005) 37 Cal.4th 428, 434.)

Although *Kaiser Foundation* was not filed until after the section 527.8 hearing in this case, the grounds for the decision were not new. As we stated in *Kaiser Foundation*, the plain language of section 527.8 together with the other statutory procedural rules permitting the introduction of declarations and affidavits plainly supported the admission of hearsay evidence. (*Kaiser Foundation, supra*, 201 Cal.App.4th at pp. 556-558.) Tri-City's failure to raise this argument with the trial court deprived the court of the opportunity to rule on the issue.

In any event, on our review of the entire record, Tri-City did not meet its burden to show prejudicial evidentiary error. "[E]ven where a trial court improperly excludes evidence, the error does not require reversal of the judgment unless such error resulted in a miscarriage of justice." (*Poniktera v. Seiler* (2010) 181 Cal.App.4th 121, 142.) " '[A] "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800.) The appellant has the burden of demonstrating prejudice. (*In re Marriage of McLaughlin* (2000) 82 Cal.App.4th 327, 337.)

Tri-City contends the court's ruling was prejudicial because Hernandez's report contained information establishing that Sterling "had caused Lawyer's arm to bleed" and thus that "Sterling was the 'aggressor' who attacked the security guards." On this issue,

21

the report stated that "When asked, Lawyer stated that during the situation, Sterling grabbed his (Lawyer's) arm causing a scab to break. Lawyer explained that the scab was from a previous injury."

However, the evidence that Lawyer *claimed* Sterling caused the bleeding by grabbing his arm during the first February 24 incident was cumulative. As Tri-City acknowledges, the court was fully aware that Lawyer had blood on his arm after the incident. Numerous witnesses testified to this fact without objection. Further, although the court sustained many objections regarding the cause of this injury, Sterling *admitted* in her testimony that Lawyer told her that *she* was the cause of the blood. Tri-City's in-house counsel (Soskins) additionally testified (without objection) that he saw Sterling "grab" Lawyer's arm. In light of Sterling's admissions and Soskins's testimony, the court was fully aware that Lawyer claimed that Sterling caused his injury by grabbing his arm, which caused a scab to break and bleed. Thus, the fact that Lawyer made this same claim to Tri-City's security officer and that the officer included this information in his report would not have materially added to the evidence.

Additionally, Hernandez's report contained multiple levels of hearsay and thus had obvious reliability problems. Tri-City never explained why it was necessary to rely on this hearsay report when Hernandez was present at the hearing to testify. Despite Hernandez's presence at the courthouse, Tri-City's counsel said she did not want to call him to testify about the relevant events other than to authenticate the report. Further, although Tri-City's counsel informed the court that she did not call Lawyer as a witness because he was visiting "ill family" in North Carolina, Tri-City produced no evidence to

22

support this claim and never presented evidence that it had made reasonable efforts to obtain his testimony. Nor did Tri-City's counsel explain why it was not also seeking a protective order on Lawyer's behalf as he was the only person who claimed to have been injured ("bloodied") by Sterling during the incident.

It was Tri-City's burden to show through clear and convincing evidence the factual basis for a protective order. It is not reasonably probable the court would have reached a different conclusion based on the hearsay-within-hearsay statements contained in Hernandez's written report. The court found that Sterling was attempting to make her way around the officers when she may have inadvertently bumped into, or touched, one or more of the officers. The information contained in Hernandez's written report is consistent with this factual scenario. Given the undisputed evidence that there was a physical clash between Sterling and the Tri-City security officers and the court's findings regarding Sterling's determination to walk into the room before the meeting began, the fact that there was sufficient contact between Sterling and Lawyer to cause a scab on Lawyer's arm to break does not necessarily show Sterling committed a violent act under the statute or that she was likely to be violent in the future.

Tri-City repeatedly argues that if the court had considered the report, it "might have reached a different decision because this was a close case." The argument is unsupported by the record. The court's comment characterizing the case as "close" was made when Tri-City rested its case, not after the court had heard all of the evidence and argument. And even if the case was "close," Hernandez's report was unlikely to have altered the court's conclusions.

23

STERLING'S CROSS-APPEAL

In her cross-appeal, Sterling contends the court erred in denying her motion for attorney fees under the private attorney general statute. (§ 1021.5.)

## I. *Background*

After prevailing on the section 527.8 petitions, Sterling sought $556,355 in attorney fees (including a multiplier of 4) under section 1021.5. Sterling argued her successful defense of Tri-City's petitions "resulted in the enforcement of an important right affecting the public interest" and provided a "significant benefit" to the general public. (Boldface omitted.) In support, she presented evidence that 33,860 individuals had voted for her in the last Board election; she was currently in her third term and had been a Board member for more than 10 years; and her term was scheduled to expire in November 2012.

Sterling argued that if Tri-City had been successful in obtaining the protective orders she would have been required "to remain at least one hundred feet away from the public meeting room," and this restriction "would have directly prevented [her] from exercising her freedom to speak and assemble, interacting with her constituents, and deliberating on issues of public importance with her fellow Board members." She further argued that "a stigma would have attached to [her], inhibiting her ability to advocate on behalf of her constituents." She additionally claimed that her successful defense of Tri-City's action protected her "constituents' right to be served by the representative they selected in a democratic election." She also claimed the petitions were filed in bad faith

as they were frivolous and merely a vehicle to provide the Board a means to continue excluding her from the Board meetings.

Tri-City countered that Sterling was not entitled to section 1021.5 attorney fees because her successful defense did not change the status quo and therefore had no practical effect. Tri-City pointed out that the Board has imposed numerous sanctions barring Sterling from personally attending Board meetings, including requiring her to "participate . . . only by teleconference from another room . . . more than 100 yards away, from the main Board room." In each protective order petition, Tri-City had specifically noted that any injunction should expressly permit Sterling "to attend Board of Directors meetings in the facilities building conf[erence] room." Tri-City thus argued that the "denial of the Petitions has had no impact whatsoever on the terms and conditions under which Sterling participates in Board meetings, 'exercise[s] her freedom to speak and assemble, interact[s] with her constituents, and deliberat[es] on issues of public importance with her fellow Board members. . . . She remains subject to the [Board's] sanctions, which permit her to participate in Board meetings only by teleconference from a location more than 100 yards distant from the main Board room." Tri-City also argued that Sterling protected only "a personal right," rather than a public benefit.

After a hearing, the court denied Sterling's motion. The court found Sterling did not meet her burden to establish each of section 1021.5's statutory elements, including that her successful defense "conferred a significant benefit on the general public" and that it vindicated "an important right affecting the public interest." In reaching these conclusions, the court agreed with Tri-City's argument that even if Tri-City had been

25

successful in obtaining the protective orders, the orders would not have had a significant effect on Sterling's ability to represent her constituents because she was subject to the same or similar limitations under the Board's sanctions/censure orders.

## II. *Applicable Legal Principles*

Under section 1021.5, " 'the court may award attorney fees to a "successful party" in any action that "has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any.". . .' " (*Graham v. DaimlerChrysler Corp*. (2004) 34 Cal.4th 553, 565.) Both prevailing plaintiffs and prevailing defendants are entitled to attorney fees upon a proper showing. (*Environmental Protection Information Center v. Department of Forestry and Fire Protection* (2010) 190 Cal.App.4th 217, 231-232; *DiPirro v. Bondo Corp.* (2007) 153 Cal.App.4th 150, 199 (*DiPirro*).)

"Whether the applicant for attorney fees has proved [each of] section 1021.5's elements is a matter primarily vested in the trial court." (*Wal-Mart Real Estate Business Trust v. City Council of San Marcos* (2005) 132 Cal.App.4th 614, 620.) " ' " 'The trial court is to assess the litigation realistically and determine from a practical perspective whether [the statutory] criteria have been met.' [Citation.]" [Citation.]' " (*DiPirro, supra*, 153 Cal.App.4th at p. 197; *Lyons v. Chinese Hospital Assn.* (2006) 136 Cal.App.4th 1331, 1344.) "The trial judge is considered to be in the best position to

26

determine whether the criteria have been met, and its determinations will not be disturbed ' "unless the appellate court is convinced that it is clearly wrong." '. . . ." (*County of Orange v. Barratt American, Inc.* (2007) 150 Cal.App.4th 420, 441.) To demonstrate a prejudicial abuse of discretion, " ' " 'it must clearly appear that the injury resulting from such a wrong is sufficiently grave to amount to a manifest miscarriage of justice . . . .' " ' " (*Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1291.) We apply a de novo review standard to questions of law, such as the proper interpretation of the statute to undisputed facts. (See *Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1175-1176.)

### III. *Analysis*

The trial court did not abuse its discretion in concluding that Sterling did not meet her burden to show an essential statutory predicate for obtaining section 1021.5 attorney fees: that her successful defense conferred a significant benefit on the general public or a large class of persons. In the proceedings below, Sterling identified the significant public benefit as preserving her ability to adequately represent the 33,860 individuals who voted for her in the past election. However, the court found that the lawsuit would not have had a practical effect on her ability to represent her constituents because the protective order would have resulted in essentially the same restrictions that were already in place based on the current sanctions and censure orders.

This factual conclusion is fully supported by the record. Regardless of the outcome of the lawsuit, before and after the lawsuit the sanctions orders prohibited Sterling from attending Board meetings except through a telephonic procedure where she

27

was in a separate room from the other Board members.[7]  If the court found that Tri-City proved the necessity for the protective orders, the court would be required to narrowly tailor the order to provide Sterling with the similar opportunity to participate in Board meetings.  (See § 527.8, subd. (c) [section 527.8 "does not permit a court to issue . . . [an] injunction prohibiting speech or other activities that are constitutionally protected"].)

On appeal, Sterling argues that the section 527.8 orders would have created additional burdens, including that if Tri-City had been successful in obtaining the protective orders, her political career would have been destroyed because "[it] is difficult to see how [she] could ever meet with her constituents—let alone get re-elected—once the public had it on the word of the court that she committed or threatened to commit violence on others."

Assuming Sterling properly raised these issues below, they do not show the court abused its discretion.  With respect to Sterling's ability to continue to meet with her constituents (in person or by phone or e-mail), the court had reasonable grounds to reject this claim as speculative.  With respect to the reelection issue, the court had a reasonable basis to conclude that the record did not support that Sterling's reelection would provide the public with a significant public benefit.  Sterling's own desire to be reelected was a personal matter.  Although the public certainly has a significant interest in a free and fair election to select its next representative, there is no showing that Sterling is the person

_____

7    As noted earlier, in this appeal we are not addressing the propriety of the sanctions orders.  (See fn. 3, *ante.*)  With respect to attorney fees, we refer to the sanction orders only to analyze the effect of Sterling's successful defense on the existing circumstances.

28

whom the public would choose or that a protective order would have precluded a fair and free election.

Sterling contends that when a defendant is the prevailing party, the status quo will generally be preserved, and therefore that fact cannot be used to deny section 1021.5 attorney fees. While this may be true as a general principle, in this case it was Sterling who identified the substantial public benefit as preventing Tri-City from ostracizing her from Board meetings and barring her full participation as a Board member. It was in response to *this* argument that the court found the lawsuit did not in fact result in these benefits. The court's analysis was appropriate. Following applicable legal standards, the court took a broad pragmatic approach and realistically assessed "from a practical perspective" whether Sterling's victory made any real difference, i.e., conferred a substantial benefit on the general public. The court decided that it did not. The court's conclusion is reasonable and supported by substantial evidence, and therefore it is binding on this court.[8]

---

[8]     We disagree with Sterling's claims that the issue is a legal question to be reviewed de novo. In determining whether a prevailing party conferred a significant benefit on the public, a court must engage in factual assessment of the results achieved and the practical effect of those results. We review the court's conclusion on this issue under an abuse of discretion standard. (See *Flannery v. California Highway Patrol* (1998) 61 Cal.App.4th 629, 634.)

DISPOSITION

Orders affirmed.  The parties to bear their own costs on appeal.


HALLER, J.

WE CONCUR:


HUFFMAN, Acting P. J.


O'ROURKE, J.