Filed 7/23/14  Marriage of I.T. and A.T. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Marriage of I.T. and A.T. | |
| I.T., | G048821 |
| Respondent, | (Super. Ct. No. 09D008017) |
| v. | O P I N I O N |
| A.T., | |
| Appellant. | |

Appeal from an order of the Superior Court of Orange County, Glenn R. Salter, Judge.  Reversed and remanded with directions.

Family Violence Appellate Project, Nancy K.D. Lemon, Jennafer Dorfman Wagner; Mayer Brown LLP, Donald M. Falk, Hamsa M. Murthy, and Jonathan A. Helfgott for Plaintiff and Appellant.

Milton B. Tennant for Defendant and Respondent.

A.T. appeals from an order denying her application made under the Domestic Violence Prevention Act (Fam. Code, § 6200 et seq., the Act), for a domestic violence restraining order against her former husband, I.T.[1]  She contends the trial court applied an incorrect legal standard and its order is not supported by substantial evidence. Because we agree the trial court erroneously construed the Act as requiring A.T. to establish she was not the primary aggressor in the parties' altercations, we reverse the order and remand for further proceedings.

FACTS AND PROCEDURE

On December 26, 2012, the trial court granted in part A.T.'s ex parte request for a temporary domestic violence restraining order against I.T. until the hearing on her application.  The hearing on her application took place in January 2013, and the following evidence was developed at that hearing.

A.T. and I.T. were in a relationship for several years before they married in 2004.  They had one child, C.T., born in September 2006.  A.T.'s daughter, K.S., born in 1995, lived with them.  A.T.'s nephew also lived with them at times.  Now divorced, A.T. and I.T. were awarded joint legal and physical custody of their son.

A.T. and I.T.'s relationship was marked by constant fighting and arguing—I.T. testified they argued weekly if not daily.  It is undisputed I.T. had a volatile temper and anger control problems that frequently resulted in his throwing, hitting, or kicking items—often at A.T.  A.T. admitted she routinely hurled profanities at I.T. and sent profanity laced text messages and e-mails to him.  For example A.T. agreed she routinely called I.T. an "asshole," "loser," "piece of shit," "motherfucker," "pedophile," and "pervert" in front of the children.  A few days before the incident that prompted A.T.'s

---

[1]      Appellant's motion to use pseudonyms throughout the opinion is granted. All further statutory references are to the Family Code, unless otherwise indicated.

domestic violence restraining order application, she sent I.T. a text message saying, "'I fucking hate you.  You truly are the spawn of the devil rotten to your core.  You're always a piece of shit.  I don't need to remind you.  The look of disappointment on your son's face should be enough. . . . "  A.T.'s friend, who was with her when the incident precipitating A.T.'s domestic violence restraining order application took place, was a witness at the hearing.  She testified she heard A.T. calling I.T. a "fuck," "shit," "loser," "piece of shit," and "coward" possibly hundreds of times.  On many occasions she unsuccessfully tried to stop A.T. from arguing with I.T.  I.T. testified that whenever he and A.T. started arguing he would say, "'I'm done fighting.  I'm done arguing.  I'm done with this relationship' or I'll just say 'I'm done' and walk away."  A.T.'s common response would be along the lines of, "'You're always saying you're done.  You're always saying that.  You're always walking away.  Walk away like the coward you are.  You're a coward.  Come back and face me like a man.  Talk to me like a man.  You're not a man.'"

A.T.'s domestic violence restraining order application was filed the day after a contentious custody exchange on December 23, 2012.  Before describing the details of that incident, we recount the evidence regarding the prior acts of abuse alleged by A.T. to have occurred before and during the marriage.

A.T. testified that in September 2002, when they were staying at her parents' house, I.T. punched her in the nose with a close fist, drawing blood, and causing her head to fly backwards and hit the door behind her.  I.T. testified that on that occasion he and A.T. had been arguing.  I.T. had "had enough of the fight" and was trying to leave the house through the front door when A.T. pushed him from behind.  When he spun around, his hand somehow hit her in the mouth.  Neither of them knew how it happened.  There was no blood but she had a puffy lip afterwards.

A.T. testified that in 2004, she and I.T. were at a bar arguing. As I.T. was walking away and A.T. was following behind, he stuck his foot back striking her shin, but she was not injured.

A.T. testified that during an argument in 2008, I.T. placed her in a "choke hold" and it was difficult to breath. Her daughter K.S. testified she witnessed this argument, and when she tapped I.T. on the arm telling him to stop, he did. A.T. testified I.T. threw a coat hanger at her and once he threw a pair of wet jeans in her face. I.T. admitted he once threw a pair of jeans or a towel at A.T. while they were folding laundry—it was about 10 years earlier, but he did not remember ever throwing a coat hanger at her.

A.T. and I.T. separated in 2009, when I.T. moved out and filed a petition for dissolution of the marriage. An October 2009 mediation resulted in a parenting agreement specifying the days C.T. would be with each parent. As for Christmas, the agreement stated C.T. was to be with A.T. from noon on December 24 until noon on December 25; and with I.T. from noon on December 25 until noon on December 26. The agreement included a "[r]ight of [f]irst [r]efusal" whereby if the parent with custody needed childcare for C.T. for more than two hours, he or she would first give the other parent the option to care for C.T. during that time.

A.T. testified that during their separation she continued to see I.T. and attempt to reconcile. A.T. testified to an argument she and I.T. had sometime in 2010, while A.T. and I.T. were separated, that lasted "all day." She testified I.T. picked up a large candle and threw it at her head. She ducked and the candle hit the cabinet behind her, bounced off, and struck her in the back of the head. I.T. testified he threw the candle into the kitchen and it hit a cabinet a few feet away from A.T.

In early 2011, I.T. moved back in with A.T. for about nine months. I.T., however, had begun seeing another woman starting around January 2010. A.T. discovered the affair in August 2011, when she accessed I.T.'s cell phone and retrieved

4

his e-mails. A.T. was angry and devastated that I.T. had had an affair. She confronted the woman twice in face to face meetings and recorded their conversations without the woman's knowledge or permission.

In October or November 2011, I.T. was staying at A.T.'s residence, and they were arguing all day about money and his affair. The children were all at home. A.T. left the residence to get away from the argument. I.T. followed her out to the car and said, "'You better get out of here before I murder you, bitch.'" K.S. testified that after A.T. left, I.T. came back into the house and started cleaning up the kitchen. K.S. came downstairs, confronted I.T. about what he had said, and said she could call the police. I.T. told her to go ahead and call the police, and then told her to go back upstairs. K.S. refused and kept arguing with I.T. I.T. threw a bowl at K.S. He told A.T.'s nephew to take K.S. upstairs "'before I do something stupid."

In late 2011, I.T. moved out of A.T.'s house and returned to live at his parents' house. A.T. continued to attempt to reconcile. She testified that on December 31, 2011, she was at I.T.'s residence and they were arguing. C.T. was in the house. A.T. testified I.T. grabbed her by the biceps and threw her on the floor. She had bruises on her arm. I.T. testified they had been in his bedroom, arguing, and I.T. tried to leave. A.T. blocked his way. He took (or grabbed) A.T. by the arms and moved her aside so he could leave. He did not throw her on the ground.

In January 2012, A.T. and I.T. were arguing about I.T.'s affair. A.T. attempted to play the recording she had made on her cell phone of her conversation with the other woman to I.T. He grabbed her cell phone and threw it against the wall.

In May 2012, A.T. and I.T. signed a marital settlement agreement A.T. had prepared. It provided joint legal and physical custody of C.T. was in his best interests, with I.T. having C.T. two weekday nights each week, every other weekend, and on holidays as specified. A.T. testified that when she served I.T. with "final divorce papers" in the summer of 2012, he spit in her face, something he had done before when they

5

argued. I.T. admitted that on that occasion only, he spit on the ground in front of A.T. from about six feet away. A.T. testified that during an argument in May or June 2012, I.T. punched a hole in the wall. I.T. admitted punching a hole in the wall sometime in the summer of 2012.

In September 2012, A.T. and I.T. took a trip to Las Vegas together. A.T. testified that in August or September 2012, during an argument, I.T. kicked a bucket at her damaging a wall. She testified C.T. was present when this happened. I.T. testified the bucket was a small plastic souvenir bucket they got on the Las Vegas trip, he kicked the bucket sideways, not at A.T., and C.T. was outside in the car with his sister.

In Fall 2012, from September 27 until about October 5, A.T. went to Rhode Island (where she grew up) for a week. She left C.T. in I.T.'s care when she was on this trip. A.T. agreed I.T. has never had any angry outbursts directed towards C.T. On that trip, A.T. met a man with whom she began a relationship. After returning from the trip, A.T. told I.T. about her new relationship, indicated she wanted to move back to Rhode Island. A.T. went to Rhode Island again from October 25 to November 1, again leaving C.T. with I.T.

The incident that precipitated A.T.'s application for a domestic violence restraining order took place on Sunday, December 23, 2012. It was I.T.'s regular custodial weekend and C.T. was with him at I.T.'s parents' house. The parenting agreement provided that on his custodial weekends, I.T. would have C.T. until Monday morning. But A.T. had asked I.T. if she could pick C.T. up at noon on Sunday instead. She wanted to go Christmas shopping and she wanted extra time with C.T. because she was leaving for Rhode Island the next weekend. I.T. agreed. On Sunday morning, A.T. told I.T. she wanted to delay and pick C.T. up two hours later. I.T. refused and insisted on the noon pick-up time. A.T. threatened to call the police if I.T. did not make C.T. available when she came for him. She then texted I.T. a copy of what she said were the court papers and she texted I.T. that she would pick C.T. at up 10 a.m.

6

When A.T. arrived to pick C.T. up, her friend was in the car with her. A.T. went to the door and started arguing with I.T. about pants she said she had sent with C.T. that had not been returned. I.T. denied having the pants. They started discussing when A.T. would be bringing C.T. back to I.T. I.T. was supposed to have C.T. on Christmas Day, which was Tuesday. As I.T. started going into the house, and A.T. was heading to her car, I.T. realized he heard A.T. say she was bringing C.T. back on Thursday, although A.T. testified she said she was returning him Tuesday. I.T. walked back outside and said, "You meant Tuesday?" A.T. put C.T. in the rear passenger side seat and walked around the back of the car getting into the driver's seat, telling I.T. to "'refer to the mediation paperwork'" as she shut the car door.

I.T. kept asking A.T. what time she was returning C.T. on Tuesday, but she kept saying he should look at the paperwork. I.T. stood behind the car, and A.T. began slightly backing the car up. I.T. slapped the back of the car with his hand. He walked around to the driver's door and tried to open it. He continued to ask A.T. what time she was returning C.T and said she could not leave until she confirmed the time. A.T. replied that she was leaving and told I.T. to move. A.T. continued backing up. As she did, I.T. slapped the front fender by the headlight. He said "'I'm done,' and [he was] calling the cops." He then picked up a newspaper from the ground and threw it against the house. A.T. testified I.T. was very agitated and angry.

A.T.'s friend who was in the car with her confirmed that I.T. was yelling and asking A.T. what time she was returning C.T., he slapped the back window of the car, he tried twice to open the driver's door, and then slapped the hood of the car. She testified that when I.T. said he was going to call the police, he said, "That's it. You're done[,]" and made a slashing motion across his throat. I.T. denied making such a hand motion. After A.T. drove away from I.T.'s house, she called 911. The police interviewed the parties and no arrests were made.

7

The next day, December 24, 2012, A.T. filed her ex parte request for a domestic violence restraining order seeking a protective order against I.T. for her, C.T., and K.S. A.T. requested she be given sole legal and physical custody of C.T. The first request was denied for lack of notice and refiled on December 26, 2012, when the court issued a temporary restraining order as to A.T. only and set the matter for hearing. The next day, A.T. left for Rhode Island, leaving C.T. with I.T.

At the conclusion of the hearing on A.T.'s domestic violence restraining order application, the court stated that "to make a finding of domestic violence it has to find that the responding part, in this case [I.T.], was the perpetrator; that is, the primary aggressor. And [A.T.], is the victim and that this is not in self-defense. That's the finding the court has to make."

Neither party requested a statement of decision, but the court gave an oral explanation for its ruling. The court observed that all the witnesses were credible in their testimony. Both I.T. and A.T. had "a temper" as demonstrated in court by the way they conducted themselves under questioning. The court observed "[A.T.] was constantly fighting with counsel[] [who had done nothing] to engender that type of response. She has a short fuse. She likes to push. You can see it in court. She's willing to engage in combat over the smallest items." The court found A.T. and I.T.'s relationship was dysfunctional "from day one" but the watershed moment was when A.T. learned of I.T.'s affair. She was clearly very angry about it. I.T.'s conduct throwing, kicking, slapping things, and punching walls, demonstrated he had "an inability to control [his] anger."

As to the December 23, 2012, incident, the court believed A.T. had said she would bring C.T. back on Tuesday, but that I.T. misunderstood her to say Thursday. That misunderstanding is what started the escalation and "it didn't help that [A.T.] kept saying, 'just read the paperwork,'" given that neither of them was really following the parenting agreement anyway. The court found prior incidents showed I.T. had an

8

inability to control his anger but did not demonstrate any intent on his part to harm A.T. or anyone else. When I.T. told A.T. "he [could] murder her" it was just talk, not a real threat.

The court then moved on to what it considered to be the issue before it. "[T]he court has to make a decision . . . who was the perpetrator. . . . [W]ho was the perpetrator in this particular matter. Who was the primary aggressor." Paraphrasing I.T.'s counsel's closing argument, the court stated it agreed A.T. knew exactly how to "push [I.T.'s] buttons . . . she has in her own way emasculated him" so he would always feel like he was losing the argument "so he keeps going on and on and on until he gets frustrated and he does something he shouldn't do." "I think when you come down to the bottom line [A.T.] is smarter than [I.T.] because she knows when to stop. She knows how to get [I.T.] to say and do things and then she stops and stands back which suggests that in terms of trying to figure out who is the primary aggressor it may well be that both parties are the aggressor in this matter." "It's hard to see [A.T.] . . . as a victim in all of this."

The court found A.T. was not in fear of I.T., nor was she in fear for her child. The court specifically observed that despite claiming she feared for C.T.'s safety, she immediately left him with I.T. when she went on to Rhode Island. However, the court specifically stated it was not taking into consideration any other "possible motive [A.T.] might have" in filing her domestic violence restraining order. In concluding, the court stated that because it could not "determine who [was] the primary aggressor in this matter" A.T. had not shown by a preponderance of the evidence domestic violence within the meaning of the Act had occurred. Therefore, it denied her request for a domestic violence restraining order.

DISCUSSION

A.T. contends the trial court abused its discretion by denying her application for a domestic violence restraining order because it applied an incorrect legal

9

standard, considered irrelevant facts is determining whether she was the victim of abuse, and failed to properly consider the entire history of I.T.'s conduct. We agree the court applied the wrong legal standard and for that reason we reverse and remand for further proceedings.

A.T. contends the trial court applied an incorrect legal standard in determining whether to issue a domestic violence restraining order against I.T. Specifically she argues the court erroneously concluded to determine whether A.T. had been abused it first had to determine whether she or I.T. was the "primary aggressor" in the dispute. Moreover, A.T. asserts that because the trial court could not decide which of them was the primary aggressor (or because she failed to establish I.T. was the primary aggressor), the court erroneously ruled A.T. failed to establish she was a victim of abuse within the meaning of the Act. A.T. argues there is no requirement of a primary aggressor finding to determine whether she suffered abuse within the meaning of the Act. We agree.

Preliminarily, we reject I.T.'s contention that because there was no statement of decision, we are limited to deciding only if substantial evidence supports denial of the domestic violence restraining order on any theory. "The general rule is that in the absence of a statement of decision in a court trial, the reviewing court must conclude that the trial court made all findings necessary to support the judgment under any theory which was before the court. [Citations.] However, this rule is merely a corollary of the general rule that a judgment is presumed to be correct and must be upheld in the absence of an affirmative showing of error. This presumption applies only on a silent record. [Citations.] In contrast, 'When the record clearly demonstrates what the trial court did, we will not presume it did something different.' [Citation.] Thus, even in the absence of a statement of decision, we are not compelled to resort to a presumption if the record adequately demonstrates the legal theory the court applied." (*Border Business Park, Inc. v. City of San Diego* (2006) 142 Cal.App.4th 1538, 1550; *Mt. Holyoke Homes,*

10

*L.P. v. Jeffer Mangels Butler & Mitchell, LLP* (2013) 219 Cal.App.4th 1299, 1315, fn. 7.) Here, the reporter's transcript plainly discloses the trial court's reasoning.

Additionally, we reject I.T.'s contention A.T. has waived or forfeited her argument because she failed to raise it when the trial court ruled. Although we generally will not "consider a challenge to a ruling if an objection could have been but was not made in the trial court," we may consider pure questions of law, such as the correct legal standard to be applied. (*San Mateo Union High School Dist. v. County of San Mateo* (2013) 213 Cal.App.4th 418, 436.)

A domestic violence prevention order may be issued to prevent a recurrence of domestic violence and ensure a period of separation for the persons involved, pursuant to an affidavit demonstrating to the court's satisfaction "reasonable proof of a past act or acts of abuse." (§ 6300; *Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1494 (*Nadkarni*); *Nakamura v. Parker* (2007) 156 Cal.App.4th 327, 334.)

"Abuse" includes intentionally or recklessly causing or attempting to cause bodily injury, sexual assault, placing a person in reasonable apprehension of imminent serious bodily injury, and molesting, attacking, striking, stalking, threatening, battering, harassing, and other conduct that can be enjoined under section 6320. (§ 6203.) The actual infliction of physical injury or assault is not required for a finding of abuse. (*Nadkarni, supra,* 173 Cal.App.4th at p. 1496 [reading and publicly disclosing e-mails]; *Ritchie v. Konrad* (2004) 115 Cal.App.4th 1275, 1290-1291 [persistent unwanted telephone calls or letters].)

Courts construe the Act liberally and may issue a domestic violence restraining order when the applicant makes the requisite showing by a preponderance of the evidence. (*Gdowski v. Gdowski* (2009) 175 Cal.App.4th 128, 137.) "A grant or denial of injunctive relief is generally reviewed for abuse of discretion. (*Salazar v. Eastin* (1995) 9 Cal.4th 836, 849-850 . . . .) This standard applies to a grant or denial of a protective order under the [Act]. [Citation.] [¶] 'The appropriate test for abuse of

11

discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' [Citation.] At the outset, however, we must determine whether the trial court applied the correct legal standard to the issue in exercising its discretion, which is a question of law for this court. 'The scope of discretion always resides in the particular law being applied; action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an abuse of discretion.' [Citations.]" (*Gonzalez v. Munoz* (2007) 156 Cal.App.4th 413, 420-421.) And we defer to the trial court's fact finding authority, including the credibility of witnesses, and view the facts in the light most favorable to the judgment. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 787.)

We agree with A.T. the trial court erred by injecting a primary aggressor element into the definition of abuse. The only reference in the Act to a "primary aggressor" is contained in section 6305 pertaining to issuance of *mutual restraining orders*. That section "regulates the issuance of *mutual* restraining orders under the [Act] by subjecting them to additional procedural requirements. [Citation.]" (*Conness v. Satram* (2004) 122 Cal.App.4th 197, 200 (*Conness*).) It provides a court *may not* issue mutual restraining orders unless both parties personally appear, both parties present evidence of abuse or domestic violence, and "the court makes detailed findings of fact indicating that both parties acted *primarily as aggressors* and that neither party acted primarily in self-defense." (§ 6305, italics added.)

I.T. argues *Conness, supra,* 122 Cal.App.4th 197, supports the trial court's application of a primary aggressor element citing the observation in *Conness,* that "[i]t is essential in a case such as this that the court rigorously evaluate the evidence to ensure that the moving party has, in fact, been victimized. This is so, particularly, where, as here, the trial court is aware that the acts *committed* by the moving party (respondent here) are significantly more violent than the acts *alleged* by the moving party." (*Id.* at

12

p. 205.)  But *Conness* involved parties who had each obtained a restraining order against the other but at separate hearings on separate days.  The court held the later-issued order was not a "mutual order" under section 6305 and thus the procedural requirements of section 6305 did not apply.

I.T.'s reliance on Penal Code section 13701 as supporting the notion that a finding of abuse requires a determination of which party was the primary aggressor is also misplaced.  That statute requires law enforcement agencies to develop policies for responding to domestic violence calls, which include requiring that peace officers make reasonable efforts at identifying the "dominant aggressor" in an incident so as to limit dual arrests.  (See *Conness, supra,* 122 Cal.App.4th at p. 204, fn. 10.)

This was not a case in which mutual restraining orders were sought, and there was no basis in the Act for requiring the person seeking a domestic violence restraining order to demonstrate she was not the "primary aggressor" (or conversely that the other person was the primary aggressor).  The trial court erred by construing the Act as containing such a requirement.  Moreover, because we cannot be satisfied this error did not guide the trial court's other factual findings—including notably its findings I.T.'s angry and physical outbursts were not intended to harm and that A.T. was not in fear of I.T.—we remand the matter for the trial court to reconsider without applying a primary aggressor element.

Because we remand for the court to reconsider its ruling, we need not address A.T.'s remaining contentions the court improperly considered irrelevant matters in ruling on her domestic violence restraining order application—specifically that A.T. was a "button pusher" who goaded I.T. into his violent outbursts—and that it improperly focused primarily on the events occurring after A.T. learned of I.T.'s affair rather than the couple's entire history.  The trial court is entitled to consider *all* the circumstances in determining if there was abuse and if there is a need for a domestic violence restraining order and the weight it gives to any particular incident is within its sound discretion.

13

(*Nadkarni, supra,* 173 Cal.App.4th at p. 1495.)  Moreover, the court may consider any new information or subsequent events that have transpired since the original hearing that would bear on the issue of whether there is any need to issue a domestic violence restraining order.  We hold here only that the trial court must reconsider its ruling without imposing an erroneous "primary aggressor" element.[2]

### DISPOSITION

The order denying Appellant's application for a domestic violence restraining order is reversed and the matter is remanded for further proceedings.  Appellant is awarded her costs on appeal.


O'LEARY, P. J.

WE CONCUR:


FYBEL, J.


IKOLA, J.

---

[2] We note I.T.'s concern A.T.'s application for a domestic violence restraining order followed her announcement that she planned to relocate to Rhode Island, implying the application was filed to give herself a leg up in seeking a change of custody to facilitate such a move.  It would do little to help her in this regard.  Although there is a rebuttable presumption against awarding custody to a person subject to a domestic violence restraining order (§ 3044, subd. (a)), this presumption may be overcome by a preponderance of the evidence showing that it is in the child's best interest to grant joint or sole custody to the offending parent.  (§ 3044, subd. (b)(1).)  Furthermore, in *Keith R. v. Superior Court* (2009) 174 Cal.App.4th 1047, 1055-1056, this court warned against "the temptation to misuse domestic violence orders for tactical reasons[,]" in holding "[t]he section 3044 presumption . . . does not change the best interest test, nor supplant other Family Code provisions governing custody proceedings."